**APPLIED BIOSYSTEMS, INC., Plaintiff,**

v.

**CRUACHEM, LTD. and Cruachem Holdings, Ltd., Defendants.**

**Civ. A. No. 90–210–JRR.**

United States District Court, D. Delaware.

Sept. 6, 1991.

Jeffrey M. Weiner, Wilmington, Del. (Arthur M. Lieberman, David A. Kalow and Henry Pitman of Lieberman, Rudolph & Nowak, New York City, of counsel), for plaintiff.

Lawrence C. Ashby, Roderick R. McKelvie and W. Leighton Lord, III of Ashby, McKelvie & Geddes, Wilmington, Del., for defendants.

## OPINION

ROTH, Circuit Judge.[*]

Applied Biosystems, Inc. ("ABIO") filed this patent infringement suit against Cruachem Ltd. ("Limited") and Cruachem Holdings Ltd. ("Holdings") on May 4, 1990. On July 11, 1990 both defendants moved to dismiss this action for lack of personal jurisdiction. Following almost a year of discovery on the jurisdictional issue, briefing was completed and this Court heard oral argument on defendants' motion. For the reasons that follow, we agree with defendants that this Court lacks personal jurisdiction over Limited and Holdings, and we will grant defendants' motion to dismiss.

## I. FACTS

ABIO is the assignee and owner of two patents pertaining to the chemical synthesis of DNA: U.S. Patent No. 4,415,732 for phosphoramidite compounds and processes and U.S. Patent No. 4,458,066 claiming a process for preparing polynucleotides. It filed this action alleging that certain phosphoramidite reagents and DNA synthesizers manufactured and distributed by defendants infringe these patents. The complaint asserts three counts: for direct patent infringement, for inducing patent in-

---

[*] At the time that this case was briefed and argued, Judge Roth was a District Judge for the United States District Court for the District of Delaware. She presently serves on the United States Court of Appeals for the Third Circuit.

fringement, and for contributory patent infringement.

ABIO is a California corporation with its principal place of business in Foster City, California. Limited and Holdings are both Scottish corporations with principal places of business in Glasgow, Scotland. Both defendants are related to Cruachem, Inc. ("Inc."), a Delaware corporation which has its principal place of business in Herndon, Virginia. The relationships among Limited, Holdings, and Inc. are at the heart of the present jurisdictional dispute. In an earlier filed and related patent suit in this Court, *Applied Biosystems, Inc. v. Cruachem, Inc.*, CA 89–579–JRR, ABIO has also sued Inc. Because Inc. is a Delaware corporation, there is no question that this Court can exercise personal jurisdiction over Inc. in the related action. Limited and Holdings, however, have had almost no direct contacts with either the United States in general or Delaware in particular; essentially, their jurisdictional contacts exist through Inc.

The corporate relationships among the three members of the Cruachem Group are as follows. Holdings is an investment holding company that is not itself engaged in the manufacture or sales of any products. Holdings owns 100% of the stock of both Limited and Inc. Limited operates in Scotland, where it manufactures and sells instruments and reagents used in the chemical synthesis of DNA. These include the phosphoramidite reagents and DNA synthesizers at issue in this action. Inc. serves as the United States distributor of these products; it purchases the reagents and synthesizers from Limited in Scotland and imports them to the United States for resale. Limited's sales to other parts of the globe are accomplished through independent distributors. This corporate organization of the group has been in place since 1985. Also in that year, Inc., which was originally created in 1983, was reincorporated under Delaware law.

Since the 1985 corporate reorganization, the three corporations have shared several common officers and directors. At present, the Chief Executive Officer of both Holdings and Limited is Ian Wilkie, who also sits on the Board of Inc., and the President of Inc. is Joseph Hall, who is also a member of the Board of Holdings. Moreover, for a period of time following the corporate reorganization in 1985, Brendan Hamill served on the Boards of all three corporations. In addition, employees of each corporation have performed services for the others. For example, Limited has used an Inc. employee to perform installation services for a third party in Mexico. (Deposition of Ian Wilkie, Docket Item 35 at 351). Similarly, when Inc. was approached by a technical magazine entitled Life Science Lab Products which was seeking material for publication, the request was referred to Limited's employee, Huseyin Bozoglu, who normally writes editorials. (D.I. 35 at 225–26).

Another area in which the members of the Cruachem Group have developed an internal system of sharing resources is in financial accounting. Ordinarily, Limited manufactures products and sells them to Inc., which in turn resells them to third party customers. Inc. purchases these products from Limited at a discounted price, cheaper than that available to Limited's distributors in other parts of the world. (D.I. 35 at 334). The sales between Limited and Inc. are recorded on intercorporate accounts. When Inc. needs funding, it may defer payment to Limited, and use its resources to make payments on its other obligations. Thus, the intercorporate account is used as needed to fund the requirements of the various corporations, and the credit and debit balances of the individual corporations rise and fall over time. (D.I. 35 at 280–81). The corporations have also advertised together, holding themselves out to the public simply as Cruachem, with separately listed addresses for Inc. and Limited. (D.I. 26, Ex. B at C027231)

On the other hand, at the level of day-to-day management, Inc. and Limited are operated independently, with Ian Wilkie heading Limited, and Joseph Hall running Inc. (D.I. 35 at 53, 410–11). As Inc.'s President, Joseph Hall is responsible for such decisions as setting the prices to charge its customers, hiring and firing employees,

and issuing a particular press release. He is not required to secure the approval of either Limited or Holdings for such activities. (D.I. 35 at 385–87). It is only for large scale expenditures or operations that Inc. and Limited seek the approval of Holdings' Board in its role as parent corporation. (D.I. 35 at 414). Moreover, even though there is flexibility in the timing of payments made on the intercorporate accounts, the Cruachem Group maintains strict and precise accounting records. (D.I. 35 at 204).

Cruachem products have essentially reached the United States only through Inc. Of all the countries in which the Cruachem Group's products are sold, the United States is the single largest market, and Inc., as United States distributor, was responsible for almost half the combined income of the three corporations from 1987 through 1990. (D.I. 25 at 0051378). Obviously, Inc. has had extensive contacts with the United States in general. However, neither Inc. nor Limited has ever sold any products in Delaware, and the three corporations have had only a few minimal contacts with Delaware in particular.

The first Delaware contact for the Cruachem Group was the reincorporation of Inc. in Delaware in 1985. Second, in 1986, Ian Wilkie and Brendan Hamill of Limited, and Joseph Hall and Hugh Mackie of Inc., came to Delaware to meet with representatives of DuPont, to discuss a joint venture to develop a DNA synthesis instrument. There were, however, no follow-up meetings with DuPont, and the project was never implemented. (D.I. 35 at 123–27). Third, in 1989, Inc. sent free samples of the types of phosphoramidite reagents at issue in this action to DuPont's research facility in Wilmington, Delaware. More specifically, in an unsuccessful attempt to induce DuPont to set up an account, Inc. sent samples of four reagents to the DuPont Experimental Station for their internal research use. (D.I. 35 at 152–55). Inc. did not seek Holdings approval or even inform Holdings of this shipment to DuPont. (D.I. 35 at 388). Fourth, all three corporations have advertised in national magazines, such as *Nature* and *Science*, that have

some circulation in Delaware. Finally, Limited, Holdings, and Inc. have all received substantial financing from Delaware sources.

## II. PERSONAL JURISDICTION

■ ABIO, as plaintiff, bears the burden of establishing that this Court may exercise personal jurisdiction over defendants. When personal jurisdiction is contested and no evidentiary hearing is held, the plaintiff need only establish a prima facie case with the record viewed in the light most favorable to the plaintiff. Nonetheless, if as here, the parties have taken discovery on the jurisdictional issue, "[t]he Court need not be blind to discovered materials, and should look beyond the facade of the pleadings." *Sears, Roebuck & Co. v. Sears plc*, 744 F.Supp. 1297, 1301 (D.Del.1990) ("*Sears II*").

■ Our inquiry is governed by *Max Daetwyler Corp. v. R. Meyer*, 762 F.2d 290 (3d Cir.), *cert. denied*, 474 U.S. 980, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985), a Third Circuit decision on personal jurisdiction in a patent suit. In general, to determine whether we may exercise personal jurisdiction over a defendant, a court must first examine whether jurisdiction is authorized by the relevant state's long-arm statute, and must then assess whether the exercise of jurisdiction would satisfy the Due Process Clause. *See id.* at 293. As the Third Circuit held in *Max Daetwyler*, the first part of this analysis must refer to state law even when, as here, the underlying legal issues involve federal patent law, because Fed.R.Civ.P. 4(e) directs that in the absence of a federal service of process statute state law governs. *See id.* at 295. As a result, personal jurisdiction may not be based on an alien defendant's aggregated contacts with the United States as a whole. *Id.* at 300.

This holding, that the relevant contacts for establishing personal jurisdiction must be with Delaware in particular, and not simply the United States in general, is critical in the present case. While ABIO has demonstrated that Limited and Holdings

have had extensive contacts with the United States through Inc., it has not similarly shown that the contacts with Delaware in particular are sufficient.

## A. Delaware Law

ABIO contends that Delaware law permits this Court to exercise personal jurisdiction over Limited and Holdings under either one of two possible theories. First, it asserts that Inc. is Limited's and Holdings' general agent in the United States, and consequently the corporate boundaries among the three entities may be ignored. Under this argument, Limited and Holdings would be considered present in Delaware due to Inc.'s status as a Delaware corporation. In addition, ABIO's counsel contended at oral argument that this jurisdictional theory would eliminate the need to meet the requirements of the Delaware long-arm statute. The rationale is that once we ignore corporate boundaries, Limited and Holdings would no longer be considered foreign corporations.

The second jurisdictional theory proffered by ABIO, is that Limited and Holdings committed a tort in Delaware, thereby subjecting themselves to jurisdiction under the Delaware long-arm statute, 10 Del.C. § 3104(c). Under this argument, Inc.'s mailing of the sample reagents to DuPont's Delaware Experimental Station constituted the tort of patent infringement in Delaware, and this mailing plus the magazine advertisements amounted to inducing patent infringement in Delaware.

Because we conclude that ABIO has misconstrued the agency theory of personal jurisdiction under Delaware law, we have organized our analysis differently. Rather than dividing our discussion into the agency and tort arguments asserted by ABIO, we shall first treat the agency theory in general. Because our conclusion from this analysis is that the existence of a principal/agent relationship between two corporations does not obviate the necessity of satisfying the requirements of the Delaware long-arm statute, we will then apply the relevant provisions of that statute, including the tort sections discussed by ABIO.

### 1. *Agency*

Delaware law provides two theories under which a court may establish jurisdiction over a parent corporation based on jurisdiction over a subsidiary: the alter ego theory and the agency theory. Under the alter ego or piercing the corporate veil doctrine, courts will ignore the corporate boundaries between parent and subsidiary if fraud or inequity is shown. *See Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.,* 456 F.Supp. 831, 839 (D.Del.1978). The agency theory, by contrast, examines the degree of control which the parent exercises over the subsidiary. *Id.* at 841. The factors relevant to this determination include the extent of overlap of officers and directors, methods of financing, the division of responsibility for day-to-day management, and the process by which each corporation obtains its business. No one factor is either necessary or determinative; rather it is the specific combination of elements which is significant. *See id.*

If an agency relationship is found to exist, courts will not ignore the separate corporate identities of parent and subsidiary, but will consider the parent corporation responsible for specific jurisdictional acts of the subsidiary. In fact, unlike the alter ego doctrine, the agency theory does not require a parent-subsidiary association, *Sears II,* 744 F.Supp. at 1305, and thus this doctrine may also apply to the relationship between two subsidiaries each wholly owned by the same parent corporation, as are Inc. and Limited. Under the agency theory, jurisdiction may even be obtained on the basis of acts performed by a corporation's distributor or other marketing agent. *See Waters v. Deutz Corp.,* 460 A.2d 1332, 1334–37 (Del.Super.1983). In addition, two otherwise independent corporations may develop a restricted agency relationship covering only certain specific transactions. *Phoenix Canada Oil Co. v. Texaco, Inc.,* 842 F.2d 1466, 1477 (3d Cir.), *cert. denied,* 488 U.S. 908, 109 S.Ct. 259, 102 L.Ed.2d 247 (1988).

The differences in operation between the alter ego and agency theories have been explained in a recent law review article, Lea Brilmayer & Kathleen Paisley, *Personal Jurisdiction and Substantive Legal Relations: Corporations, Conspiracies, and Agency,* 74 Calif.L.Rev. 1 (1986), which the Delaware Supreme Court sitting *en banc* discussed with approval in *Sternberg v. O'Neil,* 550 A.2d 1105, 1125–26 n. 45 (Del. 1988) (*en banc*). The article refers to these theories as those of "merger" and "attribution." In part of the passage quoted by the *Sternberg en banc* court, the authors state:

> The difference between attribution and merger lies in the extent of this shifting of responsibility. Under the attribution theory, only the precise conduct shown to be instigated by the parent is attributed to the parent; the rest of the subsidiary's actions still pertain only to the subsidiary. The two corporations remain distinct entities. If merger is shown, however, all of the activities of the subsidiary are by definition activities of the parent. Merger requires a greater showing of interconnectedness than attribution, but once shown, its scope is broader. Under both theories, the parent is declared responsible for in-state activities of the subsidiary, but in attribution the responsibility results from causing a separate legal entity to act while in merger there is no separate legal entity at all.

Brilmayer & Paisley at 12 (quoted by *Sternberg,* 550 A.2d at 1126 n. 45). The Delaware Supreme Court in *Sternberg* stated that it "recognize[d] the merit of both approaches if the facts in a given case support their applicability." 550 A.2d at 1126 n. 45.

In the instant case, although ABIO initially alleged in its complaint that the corporate relationships among Holdings, Limited, and Inc. are fraudulent so that an alter ego theory would be appropriate, it abandoned this argument when it filed its answering brief after discovery. Indeed, even had it not done so, we could easily reject the alter ego theory since Inc., Limited, and Holdings have preserved corporate formalities, and there is no evidence what-

soever of any fraud. Yet, ABIO does presently maintain that an agency relationship exists, under which Inc.'s acts may be attributed to Limited and Holdings. As noted above, ABIO also contended at oral argument that if an agency relationship is found to exist, we may ignore the corporate boundaries among the members of the Cruachem Group, and consider Limited and Holdings to be present in Delaware based upon Inc.'s status as a Delaware corporation.

■ ABIO is only partially correct. It is true that the relationships among Inc., Limited, and Holdings are close. Considering the extent of overlap of officers, directors, and personnel, as well as the joint advertising, shared finances, and general intercorporate structure, we agree with ABIO that in many circumstances Inc. acts as the agent of Limited and Holdings, and consequently a limited agency relationship has been created. However, we reject the argument that an agency relationship with a Delaware corporation is alone sufficient to confer jurisdiction, so that it is unnecessary to meet the terms of the long-arm statute. Rather, the result of finding such an agency relationship is simply that we may attribute certain of Inc.'s acts to Limited and Holdings in assessing whether the requirements of the Delaware long-arm statute have been satisfied.

Our conclusion in this respect rests on several grounds. First, under the formulation approved by the Delaware Supreme Court in *Sternberg v. O'Neil,* 550 A.2d 1105, 1125–26 n. 45 (Del.1988) (*en banc*), finding an agency relationship simply permits a court to attribute specific acts by the agent to the principal; the agent and principal are still separate corporations. Thus, since in the present case corporate boundaries have been maintained and there is no evidence to support piercing the corporate veil, Inc.'s *status* as a Delaware corporation may not be imputed to Limited and Holdings. Rather, Inc.'s incorporation in Delaware is only relevant insofar as it constitutes a jurisdictional *act* which we may attribute to Limited and Holdings. We will examine the significance of this

contact further below, when we assess the ability of ABIO to meet the terms of the long-arm statute.

Moreover, the Delaware Court of Chancery recently considered a similar question of whether to exercise personal jurisdiction over a non-resident corporation based on that corporation's ownership of a Delaware corporation. *See Red Sail Easter Ltd. Partners, L.P. v. Radio City Music Hall Prods., Inc.*, 1991 WL 129174 (Del.Ch. July 10, 1991). The Chancery Court concluded that it could not exercise jurisdiction over a New York corporation on such a basis; the terms of the long-arm statute must be met. In considering a recent Delaware Supreme Court decision, *LaNuova D & B, S.p.A. v. Bowe Co.*, 513 A.2d 764, 768 (Del.1986), which stated that the Delaware long-arm statute confers jurisdiction to the maximum extent allowable under the Due Process Clause, the *Red Sail* court stated that:

> the [Delaware] Supreme Court did not intend in *LaNuova* to direct the trial court to ignore the specific words of Section 3104 and to henceforth analyze all questions arising under Section 3104 only in the broad terms of fundamental fairness that guide determination of the constitutional question. The Supreme Court commands that this statute be given a liberal construction so that its purpose is achieved, but it has not directed that the application of statutory words to the facts in hand be slighted.

1991 WL 129174 at *3.

In addition, the next paragraph of the *Red Sail* decision finds that the relationship between the New York corporation and its Delaware subsidiary was not sufficiently close for the application of an alter ego or agency theory. Although the Chancery Court did not explicitly consider the possibility that the subsidiary's *status* as a Delaware corporation might be attributed to the parent were there a sufficiently close relationship, it is noteworthy that the court only stated that there was not evidence to support "imputing the *acts* of the subsidiary to the parent." 1991 WL 129174 at *4 (emphasis added).

Having found that Inc. is a separate corporation which we cannot consider to be the alter ego of Limited and Holdings, under the Federal Rules of Civil Procedure, we may not proceed to exercise jurisdiction over the Scottish corporations unless we can do so under the provisions of some specific authority. The Third Circuit confronted a similar difficulty in *Max Daetwyler Corp. v. R. Meyer*, 762 F.2d 290 (3d Cir.), *cert. denied*, 474 U.S. 980, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985), when it found that a national contacts test for personal jurisdiction would be logical in cases involving federal causes of action, but concluded that it was not empowered to apply such a theory. *Id.* at 296–97. Finding no statute authorizing the exercise of jurisdiction under a national contacts theory, the *Max Daetwyler* court concluded that "the district court's power to exercise in personam jurisdiction is limited by Fed.R.Civ.P. 4(e) and by the [state] long-arm statute, whose incorporation by reference, Rule 4(e) requires." 762 F.2d at 297. Thus, jurisdiction over a nonresident must be affirmatively grounded in some specific statute or rule; it cannot be asserted simply because no specific provision forbids its exercise. No statute exists, however, which permits Delaware courts to exercise personal jurisdiction over a nonresident principal based on the mere existence of a limited agency relationship with a Delaware corporation as agent.

Moreover, the Delaware long-arm statute itself, 10 Del.C. § 3104(c), specifically contemplates that it may operate to provide jurisdiction over a principal based upon the forum contacts of its agent. Section 3104(c) states that it provides jurisdiction "over any nonresident, or his personal representative, *who in person or through an agent*," committed one of the listed courses of action. Thus, a finding of agency does not render the long-arm statute inapplicable, but simply implicates its "or through an agent" provision.

Having concluded that finding a limited agency relationship does not obviate the need to apply the Delaware long-arm statute, we now turn to that statute's provisions. In applying the statute, we may

consider the acts of an agent to the extent that these actions were directed and controlled by the principal. *See Sears, Roebuck & Co. v. Sears plc,* 752 F.Supp. 1223, 1225 (D.Del.1990) *(Sears III).*

2. *The Delaware Long–Arm Statute*

The Delaware long-arm statute, 10 Del.C. § 3104, provides, in relevant part:

(c) As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or his personal representative, *who in person or through an agent:*

(1) Transacts any business or performs any character of work or service *in the State;* ...

(3) Causes tortious injury *in the State* by an act or omission *in this State;*

(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State ...

(emphasis added). Subsections (c)(1) and (c)(3) of this statute provide for specific jurisdiction, under which the cause of action must arise from the contacts with the forum. *See Sears, Roebuck & Co. v. Sears plc,* 744 F.Supp. 1289, 1292 (D.Del.1990) *(Sears I); LaNuova D & B, S.p.A. v. Bowe Co.,* 513 A.2d 764, 768 (Del.1986). Subsection (c)(4) provides for general jurisdiction, which requires a greater extent of contacts, but which provides jurisdiction even when the claim is unrelated to the forum contacts. *LaNuova,* 513 A.2d at 768. We shall discuss the applicability of each of these subsections in turn.

a. Section 3104(c)(1)

■ Specific jurisdiction can be obtained under subsection (c)(1) if, through Inc., Limited and Holdings have conducted any business in Delaware. This subsection requires that some act must have actually occurred in Delaware, *Sears I,* 744 F.Supp. at 1294, and that the causes of action asserted by ABIO must have arisen from the Delaware contact. *LaNuova,* 513 A.2d at 768. These acts may be those of an agent that are attributed to the defendant. For example in the product liability suit of *Waters v. Deutz Corp.,* 460 A.2d 1332, 1337–38 (Del.Super.1983), the Delaware Superior Court found that Section 3104(c)(1) authorized jurisdiction over a German tractor manufacturer that had developed an agency relationship with its exclusive United States distributor. Although the German corporation had no direct contacts with this state, the agent/distributor imported 40% of its products through the Port of Wilmington, sold at least five tractors in Delaware, maintained a district manager in Delaware, and actively solicited Delaware business. *Id.* at 1333–34.

The extent and nature of Delaware contacts in the present case do not rise to the level of those involved in *Waters.* As listed above, the acts that potentially constitute transacting business in Delaware are the meeting with DuPont employees in Delaware in 1986, the shipment of free samples to the DuPont Experimental Station in 1989, the advertising in national magazines with circulation to Delaware, and the financing from Delaware sources.

Two of these contacts, the DuPont meeting in 1986 and the Delaware financing, did occur in Delaware, but they are completely unrelated to the causes of action asserted here. The participants at the 1986 meeting with DuPont discussed a particular invention which was never developed, and which bears no relation to the allegedly infringing products at issue in this action. Similarly, there has been no demonstration by ABIO that the methods by which Limited and Holdings are financed are relevant to the patent issues in this suit. The shipment of samples and the advertising pose the opposite problem. Some of the causes of action asserted here do arise out of these acts, since mailing samples of an infringing product may constitute direct patent infringement, *see Patent Tube Corp. v. Bristol–Myers Co.,* 25 F.Supp. 776, 777 (S.D.N.Y.1938), and a cause of action for inducing patent infringement arises out of

advertising. These acts, however, do not constitute transacting business in Delaware.

■ Under Delaware law, the "[s]hipment of goods into a state by common carrier, without more, does not constitute 'transaction of business'" under Section 3104(c)(1). *Moore v. Little Giant Industries, Inc.*, 513 F.Supp. 1043, 1046 (D.Del. 1981), *aff'd*, 681 F.2d 807 (3d Cir.1982). This is especially true where, as here, the shipment was an isolated incident and no orders resulted from this solicitation. Similarly, in order for advertising to meet the terms of Section 3104(c)(1), it must be specifically directed toward Delaware residents, *Sears I*, 744 F.Supp. at 1293, and must be part of a "sustained promotional campaign" directed at Delaware. *See Max Daetwyler*, 762 F.2d at 300. Advertising in widely distributed national magazines does not qualify as transacting business in Delaware. *Sears I*, 744 F.Supp. at 1293.

■ In addition, although the joint advertising for Limited and Inc. certainly constitutes an act by Limited and may be imputed to Holdings as the parent of the two corporations, the 1989 shipment of free samples to the DuPont Experimental Station may not similarly be attributed to Limited and Holdings. As stated above, Ian Wilkie testified at his deposition that Inc. did not seek Holdings' approval before making this shipment, nor is it the type of transaction of which Holdings' Board would have been informed afterward. (D.I. 35 at 388). The evidence also indicates that at the level of day-to-day operations, Inc. acted independently. Under the agency theory, however, only acts by the agent which were directed by the principal may provide the basis for jurisdiction. *Sears III*, 752 F.Supp. at 1225. Without any evidence that Limited and Holdings directed this solicitation of DuPont, we are unable to attribute this act to Limited and Holdings.

### b. Section 3104(c)(3)

■ Jurisdiction may be obtained under subsection (c)(3) when a nonresident or its agent has caused tortious injury in Delaware by an act or omission that occurred in this state. Like subsection (c)(1), subsection (c)(3) also provides for specific jurisdiction, and requires that the tort claims at issue arise out of the Delaware acts or omissions causing the injury in Delaware. *LaNuova*, 513 A.2d at 768. Thus, this subsection poses similar barriers to asserting jurisdiction over Limited and Holdings.

Subsection (c)(3) is implicated because patent infringement is a tort, and the complaint alleges three counts of patent infringement. No other types of torts are claimed here, however, and consequently several of the jurisdictional contacts asserted are irrelevant to this action. We have already noted above that the Delaware financing and the 1986 meeting with DuPont bear no relation to the patent infringement claims at issue here; if any tort causes of action arose out of these Delaware contacts they have not been asserted in this action. Moreover, a similar obstacle bars grounding jurisdiction on the 1985 act of reincorporating Inc. in Delaware.

The incorporation of Inc. in Delaware may easily be attributed to Limited and Holdings under Delaware law. The Delaware Supreme Court considered this issue in *Sternberg v. O'Neil*, 550 A.2d 1105 (Del. 1988) (*en banc*). That case involved an Ohio corporation that had consented to jurisdiction in Delaware by registering to do business in the state; consequently service of process was completed by serving its registered agent in Delaware pursuant to 8 Del.C. § 376, *see Sternberg*, 550 A.2d at 1122 n. 36, and it was not necessary to refer to the long-arm statute. Nonetheless, the *Sternberg* court considered the question of agency under the due process prong of its inquiry, and held that even owning an already incorporated Delaware subsidiary for a period of time constitutes a contact between the parent corporation and the state of Delaware, because "[t]he decision to reincorporate or not to reincorporate in a particular jurisdiction is a deliberate one." *Id.* at 1121. Thus, the incorporation of Inc. in Delaware would provide specific jurisdiction over any tort causes of action related to the act of incorporation.

*Sears II,* 744 F.Supp. at 1303. Yet, because Section 3104(c)(3) provides only for specific jurisdiction, the act of incorporation does not confer jurisdiction for unrelated torts, *see id.* at 1305, and the present suit is confined to patent infringement.

Nor can jurisdiction be obtained under subsection (c)(3) based upon the Cruachem Group's advertisements in national magazines. As with the transacting business provision of the long-arm statute, this subsection requires that an act be committed in Delaware. *Sears I,* 744 F.Supp. at 1294. Since as already noted, there is no evidence that the advertisements have been targeted to Delaware residents in particular as part of a specific promotional campaign, they are insufficient to constitute the tort of inducing patent infringement in this state.

The remaining Delaware contact is the 1989 shipment of free samples to the Du-Pont Experimental Station. We have already found that the agency theory does not permit us to attribute the DuPont sample shipment to Limited and Holdings. Yet, even were we able to do so, this act would not provide jurisdiction under Section 3104(c)(3). Although the shipment may provide the basis for a patent infringement tort cause of action, this Court has held that the act of mailing promotional material to Delaware from outside the state is completed with the act of mailing, and does not occur in Delaware. *Sears I,* 744 F.Supp. at 1294.

This Court's conclusion in *Sears I* was based largely on the fact that a broad interpretation of what constitutes an "act or omission *in the State*" under subsection (c)(3) would eviscerate the distinction between subsections (c)(3) and (c)(4). As discussed below, the latter subsection authorizes jurisdiction when an act is committed *outside* the State but further requires a general presence by the defendant in Delaware. Thus, as this Court concluded in *Sears I,* "[s]imply put, in order for a defendant to commit an act in Delaware and be subject to subsection (c)(3), the defendant, or an agent of the defendant, must be present in Delaware when the deed is done." 744 F.Supp. at 1294.

■ Moreover, subsection (c)(3) requires not only that an act be committed in Delaware, but also that the injury occurs in Delaware. The situs of the injury of patent infringement, however, is the place of the patent holder's residence. *See Acrison, Inc. v. Control and Metering Ltd.,* 730 F.Supp. 1445, 1448 (N.D.Ill.1990). In the present case, since ABIO is a California corporation with a principal place of business of business in California, that state is the location of the injury, and not Delaware.

The strongest support for ABIO's argument that mailing the samples provides specific jurisdiction under Section 3104(c)(3) is *Honeywell, Inc. v. Metz Apparatewerke,* 509 F.2d 1137 (7th Cir.1975), which also considered issues of personal jurisdiction in a patent case. *Honeywell* involved the Illinois long-arm statute upon which the Delaware statute was patterned, and Delaware courts have relied upon decisions interpreting the Illinois statute. The plaintiff was a Delaware corporation with its principal place of business in Illinois, and the defendant was incorporated in Germany. The defendant was charged with inducing patent infringement by shipping its products to this country through its United States' distributor. The court found that these shipments constituted "commission of a tortious act" within Illinois under the Illinois long-arm statute, even though the defendant had not performed any specific act in that state, because the injury to the plaintiff occurred in Illinois.

*Honeywell* may be distinguished on several grounds. Most importantly, the injury in the present case did not occur in the forum state of Delaware, but in ABIO's home of California. Thus, even were we to agree that the shipment to DuPont occurred in Delaware, ABIO would still be unable to meet subsection (c)(3)'s "causes tortious injury *in the State*" requirement. Furthermore, the *Honeywell* decision relied in part on the defendant's contacts with the entire United States, but the national contacts theory was subsequently rejected by

the Third Circuit in the patent case of *Max Daetwyler Corp. v. R. Meyer*, 762 F.2d 290, 300 (3d Cir.), *cert. denied*, 474 U.S. 980, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985). Lastly, subsequent cases in the Seventh Circuit have distinguished *Honeywell* as involving an extensive marketing program designed to blanket the state, *see Froning & Deppe, Inc. v. Continental Illinois Nat'l Bank & Trust Co.*, 695 F.2d 289, 292 (7th Cir.1982), and have questioned its continuing validity. *See Acrison, Inc. v. Control and Metering Ltd.*, 730 F.Supp. 1445, 1447–48 (N.D.Ill. 1990).

### c. Section 3104(c)(4)

■ The final subsection of the Delaware long-arm statute implicated in the present action is subsection (c)(4). This subsection provides for general jurisdiction in tort cases, and does not require any connection between the Delaware contacts and the causes of action asserted. Yet, while this provision authorizes jurisdiction even when both the tortious acts and the injury occurred outside this state, it does require that the defendant or its agent is generally present in the state. More specifically, jurisdiction is authorized only if the defendant or its agent "regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State."

Since even Inc. has made no sales in Delaware, and the Delaware contacts are confined to the few incidents outlined above, we would be hard pressed to find that any member of the Cruachem Group had engaged in a "persistent course of conduct" in Delaware or derived "substantial revenue" from activities here. *Cf. Waters v. Deutz Corp.*, 479 A.2d 273, 274–75 (Del.1984) (holding Section 3104(c)(4) provides jurisdiction over German parent corporation where subsidiary serving as exclusive United States distributor imported 40% of products through Port of Wilmington, maintained district manager in Delaware, and advertised and sold products in Delaware). In addition, we have already explained above that Inc.'s status as a Delaware corporation may not be imputed to

Limited and Holdings, and that only the act of reincorporating Inc. in this state may be so attributed. As demonstrated by a comparison with two other District of Delaware cases, this act is not enough.

In *Altech Indus., Inc. v. Al Tech Specialty Steel Corp.*, 542 F.Supp. 53 (D.Del. 1982), this Court held that it could exercise jurisdiction over a New York corporation pursuant to subsection (c)(4). The defendant New York corporation owned eighty-two subsidiaries, a "vast majority" of which were incorporated in Delaware. *Id.* at 55. The *Altech* court found that the defendant had "utilized the benefits of the Delaware corporation law in various ways," including conducting mergers and acquisitions with and amending the articles of incorporation of its many subsidiaries. Moreover, the case involved infringement of the plaintiff's trade name "Altech," and the New York defendant had allegedly directed its co-defendant Delaware subsidiary to adopt the accused infringing name. *Id.*

By contrast, in *Sears II*, 744 F.Supp. at 1306, which was also a trade name infringement case, this Court found that the terms of subsection (c)(4) had not been met. The nonresident defendant in *Sears II* only owned one Delaware subsidiary, and it had not engaged in a pattern of corporate dealings under Delaware law. The *Sears II* court compared the case before it to *Altech*, and found that "there is a clear difference between [the *Sears II* defendant's] owning and incorporation of one subsidiary, and the *Altech* defendant's 82." *Id.*

We find that the present case resembles *Sears II* and not *Altech*. There is no evidence that any member of the Cruachem Group has engaged in a pattern of activity utilizing Delaware corporate law. Rather, since there is only one Delaware subsidiary, and it has done little more in Delaware than is necessary to comply with corporate formalities, this activity is insufficient to meet the terms of subsection (c)(4).

### d. Conclusions Under the Long–Arm Statute

Thus, even though certain actions by Inc. may be attributed to Limited and Holdings

under an agency theory, the Delaware acts are still insufficient. Each of the three specific subsections of the Delaware long-arm statute implicated in this case, poses certain barriers that ABIO is unable to meet. In short, the forum contacts are too few, too insubstantial, and too unrelated to the causes of action asserted to enable us to exercise jurisdiction over Limited and Holdings under Delaware law.

### B. Due Process

Although we have concluded that Delaware law does not authorize us to exercise personal jurisdiction over Limited and Holdings, we will nonetheless set forth our analysis as to why such an exercise of jurisdiction, if authorized, would be unconstitutional. Because this case involves federal patent law, the relevant constitutional provision is the Due Process Clause of the Fifth Amendment. *Max Daetwyler Corp. v. R. Meyer*, 762 F.2d 290, 293 (3d Cir.), *cert. denied*, 474 U.S. 980, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985).

The essential due process inquiry asks whether the defendants have had sufficient minimum contacts with the forum to satisfy " 'traditional notions of fair play and substantial justice.' " *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (citation omitted). This requirement is designed to ensure that "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). Although the Third Circuit in *Max Daetwyler* reserved decision on whether a statute providing for national contacts would be constitutional, in the absence of such a statute, the situs of the requisite minimum contacts is Delaware. 762 F.2d at 295.

 The constitutionality of an exercise of specific jurisdiction turns on whether the defendant has "purposefully directed" its activity toward the forum state. If so, and if the litigation arises out of those activities, the defendant may have estab-

lished the requisite minimum contacts with the forum despite the lack of any physical contacts. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985). For an assertion of general jurisdiction to be constitutional, the defendant must have developed "continuous and systematic" contacts with the forum state. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416, 104 S.Ct. 1868, 1873, 80 L.Ed.2d 404 (1984). In the present case, Limited and Holdings do not meet the terms of either standard.

 We may first easily dispose of the argument that the Due Process Clause would permit us to exercise general jurisdiction over Limited and Holdings. As is clear from our discussion above, the Scottish corporations have not even begun to develop "continuous and systematic" contacts with the state of Delaware. In fact, in another very similar patent case, this Court found that the contacts with Delaware were insufficient to satisfy due process. *See Afros S.p.A. v. Krauss–Maffei Corp.*, 624 F.Supp. 464 (D.Del.1985). That decision involved a German corporation that owned a subsidiary incorporated in Delaware, which, like Inc., had been created for the purpose of reselling the parent corporation's products in the United States.

The *Afros* court found that the only acts committed in Delaware by either the parent or the subsidiary were the continuous incorporation of the subsidiary in Delaware and its annual franchise tax filings. *Id.* at 468. Therefore, this Court concluded that the parent's indirect relationship with Delaware was insufficient to meet the due process requirement of minimum contacts. Although, as ABIO points out, the *Afros* decision does not discuss whether the subsidiary was so heavily controlled as to be considered the agent of the parent, this omission is irrelevant. Because the agency theory only permits the attribution to the parent of the subsidiary's acts, and not of its status as a Delaware corporation, the Delaware contacts at issue here and in *Afros* are of similar magnitude despite our finding in the present case that an agency relationship does exist. Thus, we find that

Limited and Holdings have not developed constitutionally sufficient contacts with Delaware to support the exercise of general jurisdiction.

Nor does the decision in *Sternberg v. O'Neil*, 550 A.2d 1105 (Del.1988), compel a different conclusion. We find no fault with the Delaware Supreme Court's interpretation of federal constitutional law, but in essence the case is not on point. The *Sternberg* court held that a foreign corporation's ownership of a Delaware subsidiary qualifies as a minimum contact, that is constitutionally sufficient to support the exercise of *specific* jurisdiction in a suit involving the duties and responsibilities of Delaware corporations. *Id.* at 1122. The case does not support the proposition that ownership of a Delaware subsidiary qualifies as a continuous and systematic contact with Delaware under a general jurisdiction theory.

Turning to specific jurisdiction, ABIO relies upon two cases which found that the act of sending allegedly infringing products into the forum constituted sufficient minimum contacts under the Due Process Clause. *See Horne v. Adolph Coors Co.*, 684 F.2d 255, 260 (3d Cir.1982); *Honeywell, Inc. v. Metz Apparatewerke*, 509 F.2d 1137 (7th Cir.1975). Yet, ABIO's claims of specific jurisdiction are similarly unavailing. In both cases cited, the patent holder/plaintiff was a resident of the forum state, and thus the defendant's acts were directed toward the forum and the injury occurred there.

In *Horne*, the Third Circuit found that the defendant was aware that placing infringing products in the stream of commerce would cause injury to the patent holder, and consequently held that it constituted purposeful availment when the defendant placed its products into "the stream of interstate commerce, and some of them actually were sold in New Jersey, where the patent owner resides." 684 F.2d at 260. Similarly, in *Honeywell*, the Seventh Circuit found that the defendant "was acting with the knowledge that exportation of the accused devices to the United States would infringe [the plaintiff's] patent

rights," and nonetheless shipped products into Illinois which was patent owner's principal place of business. 509 F.2d at 1144.

In the present case, by contrast, any injury occurred not in this forum but in ABIO's home of California. In fact, in *Max Daetwyler*, the Third Circuit distinguished *Horne* and *Honeywell* in this same manner. *See Max Daetwyler*, 762 F.2d at 299 n. 12 ("In [*Horne* and *Honeywell*], not only were numerous sales made within the respective forum states, but also in personam jurisdiction was exercised to protect the intangible property interests of residents of the forum state."). Moreover as discussed above, the only contacts which are sufficiently related to patent infringement claims to provide the basis for specific jurisdiction are the 1989 shipment of samples to DuPont and the magazine advertisements. There is, however, no evidence that Limited and Holdings directed the 1989 shipment at all, no less that they purposefully directed that the Delaware facility of DuPont be contacted. In addition, advertisements will only provide a constitutionally sufficient basis for specific jurisdiction when they amount to "a sustained promotional campaign, directed to residents" of the forum state, *Max Daetwyler*, 762 F.2d at 300, and we have already found that the Cruachem advertisements did not rise to this level. Thus, ABIO has not shown that Limited and Holdings purposefully directed any conduct toward Delaware upon which specific jurisdiction may be grounded.

A final factor in the constitutional inquiry of "fair play and substantial justice" is the extent of the burden imposed on the parties. In *Asahi Metal Indus. Co. v. Superior Court of California*, 480 U.S. 102, 114, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987), the Supreme Court noted that once minimum contacts have been established "often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." Although we cannot even reach this level in the present case, it is noteworthy that this factor as well counsels against the exercise of jurisdiction over the Scottish corporations. More spe-

cifically, in *Asahi*, as here, the plaintiff was not a resident of the forum state, and therefore the Supreme Court found that the interests of the forum in the litigation were "considerably diminished." *Id.* We similarly find that the interests of the state of Delaware in the present litigation are minimal.

Also under this heading of burdens on the parties, ABIO contends that "dismissal of this action would give defendants all the benefits and protections of doing business in the United States but none of the responsibilities." Answering Brief at 45. ABIO also states that while it "is aware of" the *Max Daetwyler* decision and is not presenting a national contacts theory, "it is submitted that if Due Process really does include 'traditional notions of fair play and substantial justice,' *International Shoe Co. v. State of Washington,* 326 U.S. 310, 316 [66 S.Ct. 154, 158, 90 L.Ed. 95] (1945), defendants' contacts with the United States cannot simply be ignored." Answering Brief at 44. Yet, despite ABIO's exercise of verbal gymnastics, this argument is only another formulation of the inquiry that the *Max Daetwyler* court explicitly rejected.

Moreover, dismissal of this suit in Delaware would in no way signify that the Scottish corporations could not be sued in another state. When we accept ABIO's invitation to consider Limited's and Holding's contacts with the United States in general, it appears likely that these Scottish corporations would be subject to personal jurisdiction in at least one of the fifty states. We will, however, leave to the parties any further consideration regarding in which other states jurisdiction might lie. Nevertheless, as far as the state of Delaware is concerned, the interests of justice do not weigh in favor of our exercising jurisdiction in this case.

## III. CONCLUSION

Even after almost a full year of discovery, the record reveals few Delaware contacts. As a result, we conclude that ABIO has not met its burden of establishing that this Court may obtain personal

jurisdiction over Limited and Holdings. Even when various acts by Inc. are attributed to Limited and Holdings under a limited agency theory, neither the Delaware long-arm statute nor the Due Process Clause permits us to exercise jurisdiction over the defendants. We will therefore grant defendants' motion to dismiss.