**C.R. BARD INC. Plaintiff,**

**v.**

**GUIDANT CORPORATION and ADVANCED CARDIOVASCULAR SYSTEMS, INC., Defendants.**

**No. CIV. A. 97–305–RRM.**

United States District Court,
D. Delaware.

Feb. 27, 1998.

Jack B. Blumenfeld, Morris, Nichols, Arsth & Tunnell, Wilmington, DE, John F. Sweeney, Richard C. Komson and John T. Gallagher, Morgan & Finnegan, New York City, for Plaintiff.

Frederick L. Cottrell, III and Jeffrey L. Moyer, Richards, Layton & Finger, Wilmington, DE, Richard A. Bardin, Craig B. Bailey and John K. Fitzgerald, Fulwider Patton Lee & Utecht, Los Angeles, CA, for Defendants.

## OPINION

MCKELVIE, District Judge.

This is a patent case. Plaintiff C.R. Bard, Inc. ("Bard") is a corporation organized under the laws of New Jersey and has its principal place of business in Murray Hill, New Jersey. Bard is the owner of U.S. Patent No. RE. 33,561 ("the '561 patent") and U.S. Patent No. RE. 32,983 ("the '983 patent"). Both patents claim the invention of a certain type of dilatation balloon catheter. Defendant Guidant Corporation ("Guidant") is a corporation organized under the laws of Indiana and has its principal place of business in Indianapolis, Indiana. Defendant Advanced Cardiovascular Systems, Inc. ("ACS") is a corporation organized under the laws of California and has its principal place of business in Santa Clara, California. ACS is a wholly owned subsidiary of Guidant.

On June 6, 1997, Bard filed a complaint alleging that Guidant and ACS have willfully

infringed the '561 and '983 patents. On August 8, 1997, ACS filed an answer and a counterclaim seeking a declaratory judgment that the claims in Bard's patents are invalid. Also on August 8, 1997, Guidant filed a motion to dismiss for lack of personal jurisdiction, and ACS filed a motion to transfer venue to the United States District Court for the Northern District of California. After the motions were fully briefed by the parties, the court heard oral argument on October 31, 1997. This is the court's decision on those motions.

## I.  FACTUAL BACKGROUND

The court draws the following facts from the parties' pleadings and briefs, and the evidentiary submissions accompanying the parties' briefs.

Guidant is a holding company incorporated in Indiana. Guidant does not employ anyone who works in Delaware, does not hold any bank accounts in Delaware, and does not own any property in Delaware.

Guidant wholly owns several subsidiaries, including ACS. ACS manufactures, distributes and sells dilatation balloon catheters. It researched, developed, designed and tested these catheters at its headquarters in Santa Clara, California. It manufactures the catheters at its plant in Temecula, California. ACS has supplied some of these catheters to customers in Delaware.

ACS maintains its own board of directors, separate from Guidant. The board holds regular meetings and makes all decisions about ACS's day-to-day operations, employment, and product pricing. Guidant maintains separate accounting records for ACS, and for each of its other subsidiaries. While the companies share a centralized payroll system, employees are hired and fired by the individual companies, and the companies account for wages by submitting separate tax returns to the Internal Revenue Service. The paycheck of one assembler at ACS's Temecula plant reads "Guidant" at the top, and lists "California Temecula–VI" for the location. "VI" stands for Vascular Intervention, the division of Guidant to which ACS is assigned.

In the marketing, distribution, and servicing of its dilatation catheters, ACS often uses the name of its parent, Guidant. ACS places the phrase "Guidant Vascular Intervention" on the cartons of catheters that it ships to hospitals. This same phrase, "Guidant Vascular Intervention," appears in brochures and literature for ACS's products. However, ACS also displays its own corporate logo, full address and telephone number on its cartons and in its promotional materials.

ACS maintains a toll-free number and includes this number in its promotional materials. That number is answered by ACS employees working in ACS facilities. These employees are instructed to answer the phone "ACS–Guidant customer service." If a customer calls when no operator is available, the answering machine thanks the customer for calling "Guidant customer service" and also thanks them for using "ACS and DVI products." DVI apparently stands for Devices for Vascular Intervention, Inc., another subsidiary of Guidant.

In December 1995, when the United States Food and Drug Administration ("FDA") approved the marketing of the ACS OTW Lifestream coronary dilatation catheter, Guidant issued a press release. The release claimed that Guidant had received FDA approval, and that this product was an addition to its "successful perfusion family of products Guidant offers the interventional cardiologist."

Guidant also operates a website on the Internet. The site includes financial information on the company and offers other corporate information. Under "Vascular Intervention Group" the site describes ACS's catheter products, and claims that Guidant offers "one of the broadest product lines in the industry."

## II.  DISCUSSION

### A.  Does the Court Have Personal Jurisdiction Over Guidant?

The determination of whether to exercise personal jurisdiction over a defendant involves a two-step analysis. First, the court must determine whether the Delaware longarm statute authorizes the exercise of juris-

diction. *See Max Daetwyler Corp. v. Meyer,* 762 F.2d 290, 293 (3d Cir.1985), *cert. denied,* 474 U.S. 980, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985); *Jeffreys v. Exten,* 784 F.Supp. 146, 150 (D.Del.1992). Second, if such statutory authority exists, the court must decide whether exercising that authority comports with the requirements of the Due Process Clause. *Id.; see also Compaq Computer Corp. v. Packard Bell Electronics, Inc.,* 948 F.Supp. 338, 342 (D.Del.1996).

Once a party challenges the exercise of jurisdiction by filing a motion to dismiss, the nonmoving party bears the burden of establishing that the court properly may exercise jurisdiction over the moving party. *See Joint Stock Soc'y v. Heublein, Inc.,* 936 F.Supp. 177, 192 (D.Del.1996) (citing *Carteret Savings Bank, FA v. Shushan,* 954 F.2d 141, 146 (3d Cir.), *cert. denied,* 506 U.S. 817, 113 S.Ct. 61, 121 L.Ed.2d 29 (1992)).

*1. Is There Statutory Authority for Exercising Personal Jurisdiction Over Guidant?*

Bard argues that two different provisions in the Delaware long-arm statute authorize this court to exercise personal jurisdiction over Guidant. Bard points to sections 3104(c)(1) and 3104(c)(4), which provide:

(c) As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or his personal representative, who in person or through an agent:

(1) transacts any business or performs any character of work or service in the State;

. . .

(4) causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State.

10 Del. C. § 3104.

*a. Does § 3104(c)(1) authorize the exercise of jurisdiction over Guidant?*

Section 3104(c)(1) provides for "specific jurisdiction" over a party, where that party's

actions are linked to the cause of action. *See Applied Biosystems, Inc. v. Cruachem, Ltd.,* 772 F.Supp. 1458, 1466 (D.Del.1991). If Guidant had supplied or sold catheters in Delaware, this jurisdictional analysis would be a simple one. However, ACS supplied the catheters at issue in this case to Delaware customers. Thus, Bard must establish that ACS's acts should somehow be attributed to Guidant in order to justify the exercise of jurisdiction over Guidant in Delaware.

Delaware law provides two theories that would allow a court to establish jurisdiction over the parent based upon its jurisdiction over the subsidiary: the "alter ego theory" and the "agency theory." *See Id.* at 1463; *Sears, Roebuck & Co. v. Sears plc,* 744 F.Supp. 1297, 1304 (D.Del.1990). The court will consider these theories separately.

■■■ Under the alter ego theory, a court may attribute the actions of a subsidiary to its parent and ignore corporate boundaries if the court finds that the subsidiary is a mere "alter ego" of the parent. *See Mobil Oil Corp. v. Linear Films, Inc.,* 718 F.Supp. 260, 266 (D.Del.1989). Application of this theory is often referred to as "piercing the corporate veil." *See Applied Biosystems,* 772 F.Supp. at 1463. In Delaware, to reach a parent corporation under the alter ego theory, the party asserting jurisdiction must establish some fraud, injustice, or inequity in the use of the corporate form. *See Mobil Oil,* 718 F.Supp. at 266 (explaining that the alter ego theory may apply where "there is a lack of attention to corporate formalities"); *Applied Biosystems,* 772 F.Supp. at 1463 (stating that courts will ignore corporate boundaries under the alter ego theory where "fraud or inequity is shown").

In *Minnesota Mining & Mfg. Co. v. Eco Chem, Inc.,* 757 F.2d 1256 (Fed.Cir.1985), the Federal Circuit affirmed the district court's exercise of jurisdiction over a group of shareholders under the alter ego theory. The district court had concluded that the shareholders deliberately manipulated a corporation so as to prevent plaintiff from recovering a judgment. The Federal Circuit agreed, and allowed plaintiff to recover from the shareholders themselves, noting that this was "precisely the situation in which courts feel

most comfortable in using their equitable powers to sweep away the strict legal separation between corporation and shareholders." *Id .* at 1265.

■ Bard has not produced any evidence of fraud in the corporate structure of Guidant and ACS. Bard does not claim that Guidant and ACS have ignored the formalities of separate corporate status. The two corporations maintain separate boards and finances. Thus, the court does not find a justification for exercising jurisdiction over Guidant under the alter ego theory.

■ Section 3104(c)(1) specifically extends jurisdiction to those who transact business in Delaware "in person or through an agent." Under the agency theory, the court may attribute the actions of a subsidiary company to its parent where the subsidiary acts on the parent's behalf or at the parent's direction. *See Mobil Oil,* 718 F.Supp. at 271. This theory differs from the alter ego theory in that it attributes specific acts to the parent because of the parent's authorization of those acts, but does not treat the parent and the subsidiary as one entity. *See Stinnes Interoil, Inc. v. Petrokey Corp.,* No. 82C–JN–109, 1983 WL 21115 (Del.Super.Aug. 24, 1983) (explaining that under the agency theory "the existence and entity of the agent are not ignored or set aside but affirmed, and the principal held [liable] precisely because the agent did act in the course of his employment," while under the alter ego theory "the subsidiary's corporate entity is set aside and ignored and the parent held liable") (quoted in *Mobil Oil,* 718 F.Supp. at 271). Thus, under the agency theory "only the precise conduct shown to be instigated by the parent is attributed to the parent." *Applied Biosystems,* 772 F.Supp. at 1464.

This court has noted that "some courts use the word 'agent' to describe what is essentially the same relationship contemplated by the term 'alter ego.'" *Mobil Oil,* 718 F.Supp. at 266. The Third Circuit has described the case law on parent-subsidiary relationships as "neither uniform nor clear," and has suggested that "[m]uch of the confusion stems from a failure to distinguish between subsidiaries treated as independent agencies and those in fact not independent, but considered part of the parent corporations." *Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.,* 842 F.2d 1466, 1476 (3d Cir.), *cert. denied,* 488 U.S. 908, 109 S.Ct. 259, 102 L.Ed.2d 247 (1988). When applying the agency theory, a court should focus its inquiry on the arrangement between the parent and the subsidiary, the authority given in that arrangement, and the relevance of that arrangement to the plaintiff's claim. *See id.* at 1477. The court must avoid "the notion that a parent company can be held liable for the obligations of a subsidiary [under the agency theory] purely on the basis of domination and control." *Mobil Oil,* 718 F.Supp. at 271 n. 15. Instead, there must be a "close connection between the relationship of the two corporations and the cause of action." *Mobil Oil,* 718 F.Supp. at 271.

■ A company that sets up an agent to sell its products, or who creates a network of independently-owned distributorships is "undoubtedly amenable to suit" in Delaware. *Waters v. Deutz Corp. .,* 460 A.2d 1332, 1337 (Del.Super.1983). In *Wesley–Jessen Corp. v. Pilkington Visioncare, Inc.,* 863 F.Supp. 186, 188–89 (D.Del.1993), this court found it proper to exercise jurisdiction over a manufacturing company (PBH) whose affiliate (Visioncare) was responsible for all of the distribution of its products in Delaware and elsewhere. The court found that the companies were "two arms of the same business group," and that they "apparently operate in lockstep." *Id.* The court found it significant that the business strategies and financial statements of the defendant companies were analyzed as a unit, and that PBH had agreed to indemnify Visioncare for all patent suits arising out of the sale of PBH's products. The court observed that it was "unlikely that truly independent companies would come to such an arrangement," and concluded that Visioncare was PBH's agent. *Id.* at 189.

Bard argues that Guidant should be subject to jurisdiction under the agency theory because of its "close business ties" with ACS, and its "deliberate steps to blur any purported distinction" between the companies in the eyes of physicians and hospitals. Bard

claims that Guidant has implied to the outside world that ACS is its agent, that the court should attribute ACS's actions to Guidant, and that the court should conclude that Guidant has "transacted business" in Delaware.

However, this is not a case where Guidant is manufacturing a product and then using an independent distributor or sales agent. Guidant is merely a holding company. It does not engage in any production activities. ACS makes its own decisions about day-to-day activities. ACS designed, manufactured, marketed and distributed the catheters at issue. ACS used Guidant's name on its cartons and in its brochures. Guidant is at most responsible for adopting the company policy of encouraging its subsidiaries to use its name when marketing their products. ACS's promotional materials make it clear that they come from ACS and not from Guidant. ACS prominently displays its own name, its logo, and its address on each of these items.

The court finds that Bard has not produced sufficient evidence for the court to conclude that ACS was acting as an agent of Guidant when it sold catheters in Delaware. The court will not impute the actions of ACS to Guidant under the alter ego theory or the agency theory. Thus, the court does not have statutory authority under section 3104(c)(1) to exercise personal jurisdiction over Guidant.

*b.  Does § 3104(c)(4) authorize the exercise of jurisdiction over Guidant?*

█  Section 3104(c)(4), provides for the exercise of "general" jurisdiction over a defendant in cases where the defendant's connections with Delaware do not include the activities that are the subject of the suit, but where it engages in a "persistent course of conduct" in Delaware. Bard claims that Guidant· is subject to jurisdiction under this provision due to its "advertising blitz." Bard points to the use of the Guidant name on the cartons that ACS shipped to Delaware, and the use of the Guidant name in ACS's promotional material and toll-free customer service. Bard also claims that Guidant's maintenance of a website permits anyone in Delaware to access information about Guidant and its products.

Once again, the court finds that ACS's use of Guidant's name does not justify the exercise of jurisdiction over Guidant. Those actions are insufficient to impute sales to Guidant, and are also insufficient for a finding that Guidant engaged in a "persistent course of conduct."

The court also rejects the argument that Guidant's maintenance of a website, where it provided the entire nation with general information about its company and product line, justifies a finding that Guidant has engaged in a persistent course of conduct in Delaware. The Seventh Circuit recently discussed a similar case, in which a plaintiff claimed that a defendant was "doing business" in Illinois, as required by the Illinois long-arm statute, when it did nothing more than advertise its subsidiaries' products and services in national media, and borrow money from an Illinois bank. *See IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537, 540 (7th Cir.1998). The court determined that the defendant was not subject to personal jurisdiction, and Chief Judge Posner explained that "if these relations between [defendant] and Illinois are sufficient to bring the company within the jurisdiction of the Illinois courts, then virtually every large company is within that jurisdiction." *Id.*

The court concludes that § 3104(c)(4) does not authorize the exercise of jurisdiction over Guidant, and that there is no other such statutory authority. Thus, the court will grant Guidant's motion to dismiss.

### B.  Should the Court Transfer the Case to Northern California?

A court may transfer an action pursuant to 28 U.S.C. § 1404(a) if two conditions are met: (1) the plaintiff could have brought the case initially in the transferee forum; and (2) the transfer would promote the convenience of the parties and witnesses and would be in the interest of justice. *See Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 878–80 (3d Cir. 1995). The defendant has the burden of proving that these factors militate in favor of a transfer. *See Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir.1970), *cert. denied,*

401 U.S. 910, 91 S.Ct. 871, 27 L.Ed.2d 808 (1971).

ACS argues that since its factory and its headquarters are located in California, it would be a much more convenient forum. ACS claims that most of the relevant witnesses and documents are located in California. ACS also points out that Bard and ACS have been involved in other litigation in California, and suggests that it would make sense to litigate this suit in California as well.

■ A plaintiff's choice of forum is a "paramount consideration" when considering a transfer request. *Joint Stock Soc'y,* 936 F.Supp. at 185. A court should specifically give deference to plaintiff's choice when it is due to "legitimate, rational concerns ." *Waste Distillation Technology, Inc. v. Pan American Resources, Inc.,* 775 F.Supp. 759, 764 (D.Del.1991).

■ Bard claims to have chosen Delaware as a forum because it is much closer to Bard's headquarters in New Jersey than California, and thus closer to its own witnesses and documents. Bard also claims to have chosen Delaware on the basis of this court's lighter case load. Each of these reasons have been found by this court to be legitimate and valid reasons for choosing a forum. *See Kollmorgen Corp. v. Gettys Corp.,* 760 F.Supp. 65, 67 (D.Del.1991) (closer to plaintiff's residence); *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.,* 821 F.Supp. 962, 966 (D.Del.1993) (closer to sources of proof); *Joint Stock Soc'y,* 936 F.Supp. at 190 (congestion of dockets).

Even if Bard did not have several rational reasons for selecting Delaware as a forum, ACS would not be entitled to a transfer automatically. *See Joint Stock Soc'y,* 936 F.Supp. at 187. The current state of technology makes it more difficult for defendants to argue that litigating in Delaware is inconvenient for the parties and witnesses. *See Tuff Torq Corp. v. Hydro–Gear Ltd. Partnership,* 882 F.Supp. 359, 363 (D.Del.1994). Defendants must prove that litigating in Delaware would pose a "unique or unusual burden" on their operations. *Wesley–Jessen Corp. v. Pilkington Visioncare, Inc.,* 157 F.R.D. 215, 218 (D.Del.1993).

ACS has not established that it would face any special inconvenience by litigating in Delaware. Instead, ACS focuses on how much more convenient California would be. However, the court finds that Bard has legitimate reasons for filing in Delaware, and that ACS is not particularly inconvenienced by this forum. Thus, the court will deny ACS's motion to transfer venue.

### III. *CONCLUSION*

For the reasons set out above, the court will grant Guidant's motion to dismiss, and dismiss all claims against Guidant listed in Bard's complaint. The court will deny ACS's motion to transfer venue to the District for Northern California.

The court will issue an order in accordance with this opinion.