**E.I. duPONT de NEMOURS AND COMPANY, a Delaware corporation, Plaintiffs,**

v.

**RHODIA FIBER AND RESIN INTERMEDIATES, S.A.S., a French Corporation, formerly named Rhône Poulenc Fiber and Resin Intermediates, S.A.S., and Rhodia SA, a French corporation, formerly known as Rhone Poulenc Fibres Et Polymères S.A., Defendants.**

No. Civ.A. 99–874–RRM.

United States District Court, D. Delaware.

Sept. 18, 2000.

---

P. Clarkson Collins, Jr., Richard D. Kirk, Lewes H. Lazarus, Michael A. Weidinger, Morris, James, Hitchens & Williams, Wilmington, Delaware, for plaintiff.

John A. Parkins, Robert W. Whetzel, Chad M. Shandler, Richards, Layton & Finger, Wilmington, Delaware, Lucy Reed, Stéphanie Giry, Freshfields LLP, New York City, for defendants.

## OPINION

McKELVIE, District Judge.

This is a contract case. The plaintiff E.I. duPont de Nemours and Company ("DuPont") is a Delaware Corporation with its principal place of business in Wilmington, Delaware. Defendant Rhodia is a French corporation with is principal place of business in Boulogne–Billancourt, France. Defendant Rhodia Fiber and Resin Intermediates ("Rhodia Fiber") is a French corporation and has its principal place of business in Cour-

beovoie, France. Rhodia Fiber is wholly owned by Rhodianyl SNC, which in turn is wholly owned by Rhodia.

On December 14, 1999, DuPont filed a complaint in this court alleging that it had suffered monetary damages as the result of the defendants' breach of an oral contract and oral representations that the defendants would provide additional loan guarantees necessary to support a joint venture project. Additionally, DuPont claims that Rhodia and Rhodia Fiber fraudulently induced DuPont to provide additional financing for the joint venture project and that Rhodia and Rhodia Fiber negligently misrepresented their true intent to support the project.

On March 22, 1999, Rhodia and Rhodia Fiber moved to dismiss the claims for lack of personal jurisdiction, failure to join an indispensable party, insufficiency of service of process, and forum non conveniens. Rhodia and Rhodia Fiber have also moved to dismiss the claim and compel arbitration or alternatively to stay the proceedings pending the outcome of an ongoing arbitration in Singapore. These issues have been fully briefed by the parties.

On August 2, 2000, the court held oral arguments on the motions. This is the Court's decision on these motions.

### I. *Factual and Procedural Background*

The court draws the following facts from the affidavits, documents, and deposition transcripts submitted by the parties.

#### A. *The Parties and the Joint Venture*

DuPont, the ultimate parent of DuPont China, is incorporated and has its principal place of business in Delaware. DuPont China was incorporated in 1992 under the applicable laws of China as an investment company.

Rhodia is a French corporation that manufactures and sells specialty chemicals. Rhodia, previously called Rhone Poulenc Fibres et Polymeres SA ("Rhone Poulenc EP"), changed its name on December 31, 1997, and reorganized its business holdings. In the reorganization Rhone Poulenc EP consolidat-

ed some of its working groups, divested itself of some of its subsidiaries, and emerged as Rhodia. Rhodia now centers its business around five divisions: fine organics, consumer specialties, industrial specialties, polyamide, and services and specialties. Although Rhodia does not derive substantial revenue from Delaware nor hold any bank accounts in the state, it directly and wholly owns two subsidiaries that are Delaware corporations: Rhodia, Inc. and Danube Chemicals Acquisition Corporation. Rhodia, Inc. has several subsidiaries that are also Delaware corporations.

Rhodia Fiber, previously known as Rhone Poulenc Fiber and Resin Intermediates SAS ("Rhone Poulenc FRI"), is a French corporation in the business of producing and marketing polyamide intermediates. Rhone Poulenc created Rhone Poulenc FRI around 1995. In 1997, Rhone Poulenc FRI became Rhodia Fiber.[1] In 1998, Rhodia interposed a layer of ownership between itself and Rhodia Fiber. Rhodia Fiber is wholly owned by SNC Rhodianyl, which is wholly owned by Rhodia. Rhodia Fiber does no business, holds no bank accounts, and derives no revenue from any activities in Delaware.

### B. The Negotiations

In 1992, Sinopec Liaoyang Petro–Chemical Fiber Company ("LYPFC"), a state owned enterprise of the Peoples' Republic of China, approached DuPont and Rhodia with a plan to expand existing nylon 6, 6 salt and nylon polymer flake production facilities in China through a joint venture. From December 1992 to March 1996, representatives of DuPont, Rhodia, and Rhodia Fiber discussed the possibility of creating a joint venture.

Throughout the negotiations, the parties met in various cities around the world including at least six times in Wilmington, Delaware. It is unclear now, as it was at the time of the meetings, whether the negotiating parties in these meetings actually represented the subsidiary companies—Rhodia Fiber and DuPont China—or represented the parent companies—Rhodia and DuPont. On each side, representatives from both the parent companies and the subsidiaries spoke to the other parties about the potential joint venture.

Some of the members of the negotiation team were clearly associated with Rhone Poulenc EP which became Rhodia, rather than in Rhone Poulenc FRI, which became Rhodia Fiber. Michel Maupu was such a member. Maupu, a signatory to early agreements, was a *directeur general adjoint* (the french equivalent of the Chief Executive Officer) of the Fibres et Polymeres sector, the predecessor to Rhone Poulenc EP.

Some members of the team were employed by both entities, like Pierre Levi and Bruno deSoyres. Pierre Levi served as the *President* (the French equivalent of the Chairman of the Board) of Rhodia Fiber and simultaneously served as Chief Operating Officer of Rhone Poulenc EP. Levi now serves as a director of Rhodia.

Bruno deSoyres, who often met with representatives from DuPont, states in his affidavit that from January 1, 1995 to January 31, 1999 he served as "president of the company Rhone–Poulenc Fibers and Resin Intermediates, which, on December 23, 1997 became the Company Rhodia Fiber and Resin Intermediates." This clear job description, however, is contradicted by his deposition testimony. In his deposition, deSoyres testified that in 1995 he became the director general of IFIP, a management entity within the Rhone Poulenc organization. This entity was a portion of the fibers and polymers sector of Rhone Poulenc. deSoyres further stated that "there was no company bearing the name [Rhone–Poulenc Fiber and Resin Intermediates, SAS] when I was appointed at the beginning of 1995." However, deSoyres stated he was not employed directly by Rhone Poulenc, SA and is not certain whether Rhone Poulenc Fibers et Polymeres, SA, which became Rhodia, even existed in 1995. In 1996, deSoyres was employed by Rhone Poulenc FRI, then in 1998 by Rhodianyl. Nonetheless, deSoyres was a party to the joint venture discussions from the outset and

---

1. For convenience, throughout the opinion, the actions of Rhone Poulenc EP will be described as those of Rhodia and actions of Rhone–Poulenc FRI will be described as those of Rhodia Fiber.

became a member of the board of the joint venture company.

Similarly, from DuPont's side, it is unclear which entity was negotiating. Although DuPont China had been in existence since 1989, DuPont, not DuPont China, participated in the early stages of negotiating the potential joint venture. In 1993, an agent of DuPont signed a cooperative agreement with Rhodia Fiber.

### C. *The Joint Venture Contract*

On March 26, 1996, DuPont China, Rhodia Fiber, and LYPFC signed the Joint Venture Contract and established Sanlong Nylon Company Limited ("Sanlong") under the Joint Venture Law, the Joint Venture Regulations, and other relevant Chinese laws. Sanlong was structured as a limited liability company owned 42% by DuPont China, 18% by Rhodia Fiber, and 40% by LYPFC. Neither DuPont nor Rhodia are signatories to the Sanlong Joint Venture Contract.

Under the terms of the Joint Venture Contract, the Sanlong board of directors had ten members. Four directors were appointed by DuPont China, four were appointed by LYPFC, and two were appointed by Rhodia Fiber. A director selected by LYPFC served as the chairman of the board, and a director selected by DuPont China served as the vice-chairman of the board.

The stated purpose of the Joint Venture was "to adopt advanced technology and scientific management methods for its manufacturing activities to increase the production capacities of nylon 6,6 salt and polymer flake," the intermediate building blocks of nylon, in China. To that end, Sanlong was to build a manufacturing plant in China to produce these intermediate materials.

The Joint Venture Contract required initial cash and in kind contributions of $19,698,000 by DuPont China, $8,442,000 by Rhodia Fiber, and $18,760,000 by LYPFC. In addition to these original contributions, Sanlong was responsible for obtaining subsequent loans. The contract provided that:

7.02 Financing In Addition To Registered Capital

(a) The Company [Sanlong] will be responsible for obtaining financing that is beyond or in addition to the Company's registered capital by borrowing funds from sources inside China or outside China. Upon the unanimous affirmative vote of every director of the Board, each Party shall provide guaranties for such additional financing, in proportion to the Party's contribution to registered capital....

(b) Upon the unanimous affirmative vote of every director of the Board in support of the Company obtaining additional financing by way of borrowing from the Parties, each Party shall directly or indirectly provide loans for additional financing, in proportion to the Party's contribution to registered capital....

Further, the Joint Venture Contract incorporates separate agreements with DuPont and Rhodia Fiber to share certain technology with Sanlong.

### D. *Performance Under the Joint Venture Contract*

Under the Joint Venture Contract, the Sanlong Board was to procure additional loans and award a contract for construction of the manufacturing plant by October 1996. Due to a series of unforeseen delays, however, the board did not award the Engineering Procurement and Construction Contract until April 1998. In the interim, Rhodia began to raise concerns about the commercial viability of the project.

In late 1996, the Sanlong partners began to negotiate the necessary loans with ING Bank NV, Shanghai Branch ("ING"). Rhodia Fiber and DuPont China agreed to the terms of the loan in the Spring of 1997, but did not finalize the loans because of the delays in awarding the Engineering Procurement and Construction Contract.

On April 28, 1997, after receiving a report based on the Chinese Five–Year Plan projection for nylon 6,6 salt consumption, deSoyres wrote Kenneth Wall, General Manager and Vice President of DuPont Nylon North America and DuPont Global Intermediates

and Polymers expressing concerns about the continued viability of the project. deSoyres wrote, "Two types of concerns are currently worrying me and, as you will see, they are connected. The first is about the way San Long [sic] has been, and is being operated and the second is about San Long's [sic] future."

In June of 1997, Rhodia Fiber found out that another nylon 6,6 salt facility was going to be built in China. In October or November of 1997, with the onset of the Asian financial crisis, Rhodia Fiber began expressing concerns about the continued viability of the Joint Venture Contract.

On December 4 and 5, 1997, deSoyres met with Mike Estep, representing DuPont China, and Wall in Hong Kong to discuss Sanlong's future prospects. In January, deSoyres requested another meeting. On January 22, 1998, in order to accommodate Wall, deSoyres met Wall and Estep in Wilmington, Delaware. DuPont alleges that deSoyres again stated that he was concerned about the viability of Sanlong, but assured Wall and Estep that Rhodia Fiber would continue to support Sanlong and would follow DuPont's lead.

On March 31, 1998, Sanlong held a meeting of the Board of Directors. At that meeting, the Board unanimously approved three resolutions. First, the Board finalized and approved the Engineering Procurement and Construction Contract. Second, the Board authorized an additional $12 million of funding for Sanlong. This funding was to come in part from loans guaranteed by the joint venture partners and in part from additional registered capital. Third, the Board authorized the General Manager of Sanlong to sign a $31 million loan with ING and two additional loans. The ING loan was to be guaranteed by both DuPont and Rhone Poulenc.[2] deSoyres served as Rhodia Fiber's representative on the Board and on March 31 served as the proxy for Rhodia Fiber's other representative.

By the end of Summer in 1998 neither Rhodia nor Rhodia Fiber had guaranteed the authorized loans. Therefore, DuPont agreed to guarantee interim financing without which work would not have commenced under the EPC contract. On July 14, 1998, DuPont opened a line of credit with ING on behalf of Sanlong. ING required DuPont's guarantee of this line of credit only in the event that the board-authorized ING loan did not obtain the necessary guarantees.

On August 24, 1998, Levi wrote to Wall again expressing concerns about the economic viability of the Sanlong project for DuPont and Rhodia. Levi explained that their failure to provide "the loan guarantee is just a forcing device to call decision makers to some kind of attention. Otherwise, our past experience shows that little of substance will happen." Levi, assuring Wall that under certain conditions Rhodia would guarantee the loan, stated, "We are ready to provide any loan guarantee right away as soon as we are convinced that no money will be spent on unprofitable investment, or that we can have a veto at a later date on actual spending."

On December 3, 1998, Rhodia Fiber served DuPont China and LYPFC with a notification that it intended to terminate its part in Sanlong and intended to sell its shares of the Joint Venture. On January 11, 1999, Rhodia Fiber presented data showing that it believed that Sanlong would be insolvent within three years of the start of manufacturing. Rhodia served a buy-out notice on February 24, 1999.

### E. *The Chinese Arbitration*

DuPont China commenced an arbitration against Rhodia Fiber on September 30, 1999, under the terms of Article 25.01 of the Joint Venture Contract. The Joint Venture Contract requires that all disputes that cannot be resolved through "friendly consultations" be "referred to and finally resolved by arbitration in Singapore in accordance with the Arbitration Rules of the Singapore International Arbitration Centre." In its Request for Arbitration and Statement of the Case, DuPont China seeks damages for the loss of

---

**2.** The minutes of the meeting do not specify whether the parent companies or the subsidiary companies would make the guarantees. The terms DuPont and Rhone Poulenc are not defined.

its investment and expected profits in Sanlong for Rhodia Fiber's failure to perform on the Joint Venture Contract. There is no claim in the Arbitration that DuPont China and Rhodia Fiber formed an oral contract or that Rhodia fiber made false or misleading representations. Neither Rhodia nor DuPont is a party to the arbitration.

On March 13, 2000, LYPFC commenced a separate arbitration against Rhodia Fiber claiming that Rhodia Fiber breached its obligation under the Joint Venture Contract to provide a guarantee for the ING loans.

### F. *The Present Litigation*

DuPont filed a complaint in this Court on December 14, 1999 asserting diversity jurisdiction under 28 U.S.C. § 1332. The First Amended Complaint states three counts. Count I seeks damages from Rhodia and Rhodia Fiber for breach of their oral promise to continue support of Sanlong made during the meeting on January 22, 1998. Count II seeks damages for fraudulent inducement and material misrepresentations made at the meeting on January 22, 1998 as well as other meetings. Count III seeks damages for negligent misrepresentation.

On March 22, 2000, Rhodia and Rhodia Fiber each filed a motion under Rule 12(b) of Federal Rules of Civil Procedure seeking dismissal of the complaint on four grounds: (a) lack of personal jurisdiction, (b) insufficient service of process, (c) failure to join an indispensable party, and (d) forum non conveniens. Defendants' motions also seek to compel arbitration and to dismiss or stay DuPont's claims pending the outcome of the arbitration. The defendants filed consolidated briefs in support of their motions.

### II. *Discussion*

#### A. *Motion to Dismiss for Lack of Personal Jurisdiction*

Defendants, Rhodia and Rhodia Fiber, argue that DuPont's claims should be dismissed for lack of personal jurisdiction. They argue that neither the specific actions of agents representing Rhodia and Rhodia Fiber within Delaware nor the companies'

general contacts with the state should create personal jurisdiction.

Rule 12(b)(2) of the Federal Rules of Civil Procedure requires a court to dismiss a case when the court lacks personal jurisdiction over the defendants. In determining whether the court may exercise jurisdiction over the defendants, the court must assess both the statutory and federal constitutional basis for jurisdiction. *See Max Daetwyler Corp. v. Meyer*, 762 F.2d 290, 293 (3d Cir.), *cert. denied* 474 U.S. 980, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985). First, the court must analyze whether the Delaware long arm statute, 10 Del.C. § 3104, authorizes the exercise of jurisdiction. *See id.; Joint Stock Soc'y v. Heublein, Inc.*, 936 F.Supp. 177, 191–92 (D.Del.1996). If the long arm statute authorizes jurisdiction, the court must decide whether exercising jurisdiction comports with the requirements of the Due Process Clause. *See Max Daetwyler Corp.*, 762 F.2d at 293; *Heublein*, 936 F.Supp. at 192.

#### 1. *Standard and Burden*

A party does not need to plead facts in support of this court obtaining personal jurisdiction over an opposing party. *Heublein*, 936 F.Supp. at 192. Once the opposing party challenges the exercise of jurisdiction, however, the nonmoving party bears the burden of establishing that this court may exercise personal jurisdiction over the moving party. *Carteret Savings Bank, FA v. Shushan*, 954 F.2d 141, 146 (3d Cir.) cert. denied, 506 U.S. 817, 113 S.Ct. 61, 121 L.Ed.2d 29 (1992). If the court elects to hold pretrial jurisdictional discovery, the nonmoving party cannot rely on the allegations of its complaint; it must show the jurisdictional facts through competent evidence. *Id.*

The court must accept as true all of the nonmoving party's evidence and must construe all disputed facts and reasonable inferences in favor of the nonmoving party. *Carteret Savings Bank FA*, 954 F.2d at 142, n. 1; *Heublein*, 936 F.Supp. at 192–93. Since jurisdictional discovery has begun, DuPont must make a prima facie case in support of the exercise of jurisdiction over the defendants. Whether this court grants or denies the motion to dismiss for lack of personal jurisdic-

tion at this juncture, ultimately, DuPont will have to establish by a preponderance of the evidence that the exercise of personal jurisdiction over Rhodia and Rhodia Fiber is proper. *Carteret Savings Bank, FA,* 954 F.2d at 146; *Heublein,* 936 F.Supp. at 193.

Delaware's long arm statute, 10 Del.C. § 3104 provides a means for a court to exercise specific and general jurisdiction over parties that cause injuries within Delaware. In relevant part, § 3104(c) states:

> (c) As to a cause of action brought by any person arising from a any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or personal representative, who in person or through an agent:
>
> > (1) Transacts any business or performs any character of work or service in the State;
> >
> > (2) Contracts to supply services or things in this State;
> >
> > (3) Causes tortious injury in the State by an act or omission in this State;
> >
> > (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State.

This provision is construed to confer jurisdiction to the maximum extent possible under the Due Process clause. *See Transportes Aereos de Angola v. Ronair, Inc.,* 544 F.Supp. 858, 864 (D.Del.1982); *La Nuova D & B S.p.A. v. Bowe Co., Inc.,* 513 A.2d 764, 768 (Del.1986).

Because of the communication between itself and Rhodia and Rhodia Fiber, DuPont contends that this court may exercise jurisdiction over either entity under both §§ 3104(c)(1) or (3). DuPont states that Rhodia and Rhodia Fiber carried on a course of negotiation that had a direct nexus to Delaware, either in person or through correspondence and telephone conversations. This, DuPont argues, is enough to confer jurisdiction over its claims under § 3104(c)(1). As to § 3104(c)(3), DuPont alleges that at the January 22, 1998 meeting, Bruno deSoyres provided assurances on behalf of both Rhodia and Rhodia Fiber that Rhodia or Rhodia Fiber would provide the loan guarantees necessary to the Sanlong project. As a result of these assurances, DuPont states that it agreed to guarantee additional lines of credit for Sanlong and has been financially injured by the subsequent collapse of the Sanlong project.

Further, DuPont alleges that under § 3104(c)(4), this court can exercise general jurisdiction over Rhodia. DuPont contends that because Rhodia owns two subsidiaries incorporated in Delaware from which it derives substantial revenue, it is subject to general jurisdiction. Additionally, DuPont claims that Rhodia's website is evidence of the company soliciting business in Delaware. Because of these activities, DuPont believes that this court may obtain general jurisdiction over Rhodia.

Defendants respond that the companies' only contact with Delaware was deSoyres' meeting on January 22, 1998 with Wall and Estep on behalf of Rhodia Fiber. According to defendants, this meeting was only to discuss the issues relating to the Joint Venture Contract which had little to do with Delaware. Thus, defendants' argue that this court cannot exercise jurisdiction under § 3104(c)(1) because these contacts do not have a sufficient nexus with DuPont's claims.

Defendants contend that DuPont also has failed to show that this court may exercise jurisdiction under § 3104(c)(3). First, defendants argue that DuPont is trying to recast a contract claim into a tort claim so that it may seek jurisdiction under section (c)(3). Rhodia and Rhodia Fiber claim that a promise to conform to contractual obligations cannot give rise to a claim for fraud. Second, defendants claim that DuPont has not proven that deSoyres took any action that caused any injury to DuPont and therefore this court may not exercise jurisdiction under § 3104(c)(3).

Lastly, defendants contend that mere ownership of a Delaware subsidiary and a website that is viewed globally should not subject Rhodia to general jurisdiction in this forum under § 3104(c)(4).

### 2. Jurisdiction over Rhodia Fiber

■ The court agrees with plaintiffs that under § 3104(c)(3) deSoyres's single act of misrepresentation would be enough to establish jurisdiction over Rhodia Fiber. *See LaNuova D & B, S.p.A.*, 513 A.2d at 768. ("[W]here the claim is one for tortious injury under subsection (c)(3), a single "act or omission" in the State in which the injury was caused will suffice."). Here, DuPont alleges that deSoyres fraudulently misstated Rhodia Fiber's intention to provide the additional loan guarantees. As an agent for Rhodia Fiber, deSoyres' act alone suffices to create jurisdiction in Delaware. *See Carteret Savings Bank*, 954 F.2d at 146 ("Personal jurisdiction may be exercised over a non-resident defendant who, while present in the forum state, makes a deliberate misrepresentation during the course of negotiations or other direct oral communications with the plaintiff."). DuPont need not show all of the elements to prove their case at this time. It is sufficient that DuPont has alleged the necessary elements in the complaint and provided enough evidence so that these claims could be true. At this stage of the proceeding, this court holds that DuPont has met that burden.

■ After establishing that the Delaware long arm statute authorizes jurisdiction over Rhodia Fiber, this court must determine whether exercising jurisdiction violates the dictates of due process. *See Max Daetwyler Corp.*, 762 F.2d at 293. "[D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). To establish that a defendant had sufficient minimum contacts with the forum to exercise jurisdiction, the nonmoving party must show that the moving party "purposely availed" itself of the benefits of the forum such that it should "reasonably anticipate being hailed into court in that state." *Burger King v. Rudzewicz*, 471 U.S.

462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

■ deSoyres met with Wall and Estep in Delaware on January 22, 1998 in regards to the future of the Sanlong project. At this meeting deSoyres allegedly made statements to representatives of DuPont and DuPont China concerning Rhodia Fiber's continued interest in the Joint Venture. Viewing the facts in the light most favorable to the plaintiff, deSoyres should have known that his statements would affect DuPont's decisions about providing the additional loan guarantees. Further, deSoyres could have foreseen that Rhodia Fiber's failure to provide the loan guarantees would have had a pecuniary impact on DuPont, a Delaware corporation. Thus, deSoyres and Rhodia Fiber should have anticipated that a fraudulent statement in these meetings could subject them to suit in Delaware. Therefore, deSoyres's presence in Delaware establishes the prerequisite minimum contacts with the forum state necessary to establish jurisdiction under the Due Process Clause.

### 3. Jurisdiction over Rhodia

DuPont offers several theories under which this court may exercise jurisdiction over Rhodia: substantial revenue, solicitation of business, and agency theories.

#### a. General Jurisdiction

■ Section 3104(c)(4) provides for the exercise of jurisdiction where a defendant's contacts with Delaware are not the subject of the lawsuit, but the defendant "derives substantial revenue from services, or things used or consumed" in Delaware. DuPont alleges that Rhodia derives substantial revenue from the activities of its Delaware subsidiaries, Rhodia, Inc. and Danube Chemicals Acquisition Co. The court agrees with the defendants that DuPont has not shown that the activities of Rhodia's Delaware subsidiaries are directed toward Delaware. Although these subsidiaries may provide revenue for their parent corporation, DuPont has not shown that Delaware citizens are the one's consuming the goods manufactured or services provided.

122

■ The court also rejects the argument that Rhodia's website justifies finding jurisdiction for a "solicit[ing] business" in Delaware. If owning a website justified a finding of general jurisdiction in Delaware, then virtually every major corporation would be subject to suit in Delaware's courts. *See IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537, 540 (7th Cir.1998); *C.R. Bard Inc. v. Guidant Corp.*, 997 F.Supp. 556, 561 (D.Del.1998). Thus, this court will not exercise jurisdiction over Rhodia under § 3104(c)(4).

b. *Agency*

■ DuPont contends that a principal/agent relationship existed between Rhodia and Rhodia Fiber and that either an agency relationship existed between Rhodia and deSoyres or deSoyres had apparent authority to act on Rhodia's behalf. Delaware law allows a court to find jurisdiction over a parent corporation for the acts of its subsidiary through either an alter ego theory or the agency theory. *See Applied Biosystems, Inc. v. Cruachem, Ltd.*, 772 F.Supp. 1458, 1463 (D.Del.1991). To exercise jurisdiction under the alter ego theory, the court must find sufficient facts to pierce the corporate veil. Under the agency theory, however, a court need not find the same type of fraud or inequity necessary to pierce the corporate veil in order to obtain jurisdiction over the parent company. *Id.* The agency theory differs from the alter ego theory in that the court "attributes specific acts to the parent because of the parent's authorization of those acts, but does not treat the parent and the subsidiary as one entity." *C.R. Bard Inc.*, 997 F.Supp. at 560.

DuPont argues that because Rhodia and Rhodia Fiber were part of a group enterprise rather than distinct corporate entities this court should exercise jurisdiction over the parent corporation for the acts of the subsidiary. Despite the overlap of employees and the joint corporate mission of the two entities, DuPont has not shown that Rhodia Fiber acted at the behest of Rhodia. Rhodia Fiber appeared to be making its own strategic decisions regarding Sanlong. DuPont has not produced sufficient evidence for this

court to find that Rhodia Fiber acted as Rhodia's agent throughout the Sanlong Negotiations.

Nonetheless, this court could find that deSoyres had apparent authority to operate on behalf of Rhodia. To bind a principal to the acts of an apparent agent, DuPont must show two elements. First, DuPont must prove that Rhodia, by its acts and conduct, held Rhodia Fiber or deSoyres out as its agent. Second, DuPont must have reasonably relied on this representation. *See Billops v. Magness Constr. Co.*, 391 A.2d 196 (Del.1978).

■ Viewing the facts in the light most favorable to the plaintiffs, deSoyres had been one member of a negotiating team that included individuals who represented both Rhodia and Rhodia Fiber's interests. Although at the time of the January 22, 1998 meeting deSoyres worked for Rhodia Fiber, he had been employed by several different entities throughout the course of the relationship. By including persons with multiple allegiances on the negotiating team, Rhodia may have implied that members of the team spoke for either Rhodia or Rhodia Fiber. Moreover, once this original confusion had been introduced into the negotiating process, it could have been reasonable for DuPont to believe that on January 22, 1998, deSoyres spoke for both entities.

DuPont has offered sufficient evidence to exercise jurisdiction over Rhodia under the agency theories at this time. Defendants may raise this issue again at a later date if DuPont does not demonstrate that deSoyres acted with apparent authority.

B. *Motion to Dismiss for Ineffective Service of Process*

Defendants argue that the court should dismiss DuPont's claims because it failed to effect proper service of process under the Delaware long arm statute. To serve a nonresident defendant under the Delaware long arm statute, 10 Del.C. § 3104(d), a plaintiff must serve legal process upon the Secretary of State of Delaware and send by registered mail a copy of the process and complaint to the Defendant. Plaintiffs argue that service

on Rhodia and Rhodia Fiber is governed by the Hague Convention on Service Abroad of Judicial and Extra Judicial Documents. Defendants do not dispute that they were properly served under the Hague Convention.

 Rule 4(h) by reference to Rule 4(f) of the Federal Rules of Civil Procedure requires that service upon a foreign corporation shall be effected by "internationally agreed means reasonably calculated to give notice, such as authorized by the Hague Convention." The Hague Convention applies where civil litigants have cause to transmit judicial or extrajudicial documents internationally. *See Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 699, 108 S.Ct. 2104, 100 L.Ed.2d 722 (1988). In all cases in which the Hague Convention applies the Supremacy Clause preempts inconsistent methods of service. *See id.*

 Where the state's long arm statute allows service by means other than delivery of papers abroad, service must be effectuated by the law of the forum state. *See id.* (upholding service of process to domestic subsidiary despite failure to notify foreign parent because Illinois law allowed for service in that manner). In contrast, when service of process requires transmittal of papers abroad, the Hague Convention applies. *See id.*

 Under § 3104(d) of Delaware's long arm statute, service is complete only if plaintiff sends "by registered mail to the nonresident defendant . . . a notice consisting of a copy of the process and complaint served upon the Secretary of State. . . ." This provision necessarily requires the delivery of judicial papers internationally. Thus, service of process to a foreign corporation ought to comply with the Hague Convention.

Because the Hague Convention preempts the service requirements of Delaware's long arm statute, defendants' motion to dismiss for ineffective service of process is denied.

### C. *Motion to Dismiss for Failure to Join an Indispensable Party*

Defendants request that this court dismiss the present suit for failure to join an indispensable party under Rule 19 of the Federal Rules of Civil Procedure. Specifically, defendants contend that without DuPont China as an additional plaintiff, this litigation subjects Rhodia Fiber to a substantial risk of incurring duplicative and inconsistent obligations.

DuPont responds that the damages claimed in this suit are separate and distinct from the claims of the ongoing arbitration in Singapore between DuPont China and Rhodia Fiber. Thus, DuPont argues that Rhodia Fiber will not be vulnerable to multiple liability. Moreover, DuPont claims that even if DuPont China is necessary under 19(a) it is feasible to join DuPont China as a plaintiff in this litigation.

Motions for dismissal under Rule 19 require a two part analysis. First, this court must determine whether an absent party is necessary under 19(a). A party is necessary if their joinder would be compulsory if feasible. *See Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 404 (3d Cir.1993). If the absent party should be a participant in the litigation, but joinder is infeasible, then this court must decide whether that party is indispensable under 19(b). *See Angst v. Royal Maccabees Life Ins. Co.*, 77 F.3d 701, 705 (3d Cir.1996); *Janney Montgomery Scott, Inc.*, 11 F.3d at 404. If the absent party is both necessary and indispensable this court must determine "whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed." F.R.C.P. 19(b).

Rule 19(a) states in pertinent part:

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if:

(1) in the person's absence complete relief cannot be accorded among those already parties, or

(2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may

(i) as a practical matter impair or impede the person's ability to protect that interest or

(ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party. If the person should join as a plaintiff but refuses to do so, the person may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and joinder of that party would render the venue of the action improper, that party shall be dismissed from the action.

Rule 19(a) is written in the disjunctive. Thus, if a party's absence results in any of the problems identified in the subsections, this court will treat that party as necessary.

■ Under 19(a)(1), this court must ask whether complete relief can be accorded to the parties present in the litigation in the absence of an unjoined party. *Angst*, 77 F.3d at 705 ("Completeness is determined on the basis of those persons who are already parties, and not as between a party and the absent person whose joinder is sought."). Defendants argue that in the absence of DuPont China, Rhodia Fiber will not obtain complete relief as to its rights and obligations regarding Sanlong. DuPont, however, does not claim damages as a result of a breach of the Joint Venture Contract, rather, it claims damages as a result of fraud and misrepresentation. While there may some overlap as to Rhodia Fiber's obligations under the Sanlong agreement and this suit, this court can grant Rhodia Fiber complete relief from all of the claims of DuPont without reference to DuPont China.

Despite a finding of completeness, this court must still consider whether DuPont China is a necessary party under 19(a)(2). Rule 19(a)(2)(i) requires a showing "that some outcome of the federal case that is reasonably likely can preclude the absent party with respect to an issue material to the absent party's rights or duties under standard principles governing the effect of prior judgement." *Janney Montgomery Scott, Inc.*, 11 F.3d at 407. Defendants have not shown how judgments in this case would

effect the rights of DuPont China in its Singapore arbitration or in the future and do not seriously argue that DuPont China's interests will be thus prejudiced.

■ Defendants' main argument comes from subsection (a)(2)(ii). They contend that DuPont China's absence from this litigation would subject them to multiple or inconsistent obligations. DuPont's claims, however, are distinct from those of DuPont China and Rhodia Fiber does not face a "substantial risk" of multiple liability.

First, DuPont has asserted claims to recover for damages that it suffered as a result of the additional loan guarantees that it provided. These claims are separate from contract damages and lost profits DuPont China is seeking in the Singapore arbitration. Second, Rule 19(a)(2)(ii) is not triggered despite the fact this court may find that the defendants had a duty to provide additional loan guarantees while the arbitration panel finds that they did not. A risk of logically inconsistent decisions does not trigger Rule 19 and make an absent party indispensable. *See Schulman v. J.P Morgan Investment Mgmt., Inc.*, 35 F.3d 799, 806 (3d Cir.1994); *Sindia Expedition, Inc. v. Wrecked and Abandoned Vessel*, 895 F.2d 116, 123 (3d Cir.1990). Therefore, this court finds subsection (a)(2)(ii) inapplicable and that DuPont China is not a necessary party under Rule 19(a).

Because DuPont China is not a necessary party under Rule 19(a), this court need not determine whether it is feasible to join DuPont China under Rule 19(b). For these reasons, the court will deny defendants' motion to dismiss for failure to join an indispensable party.

### D. *Motion to Dismiss for Forum Non Conveniens*

Defendants moved to dismiss the case under the doctrine of forum non conveniens. They argue that Rhodia Fiber is available to arbitrate in Singapore and that Rhodia is willing to take advantage of this forum. In addition, defendants assert that public and private factors effecting the convenience and interests of the litigants and Delaware militate in favor of dismissal.

DuPont counters by arguing that without its consent, Rhodia may not be amenable to service in Singapore. Moreover, whether the suit went forward in either Delaware or Singapore, the defendants would have to travel. Thus, the private factors do not support dismissal under forum non conveniens. Lastly, DuPont argues that Delaware has a greater interest in the litigation than Singapore because the alleged tortious actions occurred in Delaware and the underlying joint venture was based in China rather than Singapore.

 The doctrine of forum non conveniens gives this court the power to decline jurisdiction in exceptional circumstances. See *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 504, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). The determination of forum non conveniens is fully within the discretion of this court. See *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). The plaintiff's choice of forum should rarely be disturbed and where the plaintiff brings suit in its home forum, that choice deserves an even higher degree of deference. *Id.* at 241, 255, 102 S.Ct. 252. Nonetheless, where the moving party can show that an alternative forum exists and that the plaintiff's chosen forum is oppressive and vexatious to the defendant out of all proportion to the plaintiff's convenience, a court may dismiss the case. *Id.* at 241, 102 S.Ct. 252. If an alternative forum exists, a court must assess how the choice of forum affects the private interests of the litigants and the public interests of the forum. See *id.*; *Gulf Oil Corp.*, 330 U.S. at 508–509, 67 S.Ct. 839 (1947).

 Here, DuPont has brought a claim in its home forum and that choice will be given deference. Defendants argue that Singapore could serve as an alternative forum. Generally, an alternative forum exists when the defendants are amenable to process in the other jurisdiction. See *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 180 (3d Cir.1991). It is unclear from the briefing whether Rhodia and Rhodia Fiber can be served in Singapore. Rhodia Fiber is a part of the ongoing arbitration in Singapore, but may not be amenable to further suit. Rhodia has no connection to Singapore. However, both de-fendants state that they will consent to suit. This should suffice to show an alternative forum exists. See *id.* at n. 7.

 Defendants cannot show, however, that Delaware is a more oppressive and vexatious forum for this lawsuit than Singapore.

Private factors do not weigh in favor of dismissal. Although the witnesses attached to Sanlong who live in China may be closer to litigation in Singapore, most witnesses will have to travel to Singapore to testify. DuPont is headquartered in Delaware; Rhodia and Rhodia Fiber are headquartered in France. Travel time from either location is shorter to this courthouse then to an arbitration or litigation in Singapore. This court will be able to compel third party witnesses to testify to the same extent that any other forum's court could. Moreover, documents are housed in France, Delaware, and China. Thus, the parties will have to ship some portion of the documents no matter where the litigation takes place.

The public factors also do not weigh in favor of dismissal. Defendants claim that Delaware has no interest in the outcome of this suit and that China has a strong desire for disputes relating to Chinese joint ventures, like Sanlong, to be adjudicated in China. This assertion is wrong on both counts. First, Delaware has an interest in providing a forum for its citizens to settle contract and tort disputes. Second, although Defendants claim that China has a desire to have disputes settled there, Rhodia has only agreed to consent to suit in Singapore. Therefore, there is no guaranty that China will have any part in the adjudication of this dispute.

For the foregoing reasons, the court will deny the motion to dismiss for forum non conveniens.

### E. *Motion to Compel Arbitration or, In The Alternative, to Stay the Proceedings*

Defendants argue that because there is a federal policy in favor of arbitration over litigation, this court should find a reason to compel DuPont to arbitrate its grievances as a part of the ongoing arbitration in China. Specifically, defendants advance three rea-

sons that this court should compel DuPont to arbitrate. First, defendants argue that as a third party beneficiary of the Sanlong Joint Venture Contract, DuPont should be bound by the arbitration requirements. Second, defendants argue that where a non-signatory's claims are sufficiently intertwined with an underlying contract obligation, the non-signatory is estopped from evading the arbitration. Third, defendants argue that DuPont is bound by DuPont China's arbitration agreement under agency principles.

Plaintiffs respond that DuPont is not bound as a third party beneficiary because it is asserting direct claims against Rhodia and Rhodia Fiber rather than attempting to enforce claims under the Joint Venture Contract, that the estoppel line of cases only binds signatories to arbitration against non-signatories, and that DuPont should not be bound under traditional notions of agency law.

■ Arbitration arises out of a contractual relationship between parties. Thus, as a general principle, courts have no authority to compel arbitration on a party who has not previously agreed to arbitrate disputes. *See Bel–Ray v. Chemrite, Ltd.*, 181 F.3d 435, 444 (3d Cir.1999) (citing *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)). In limited circumstances, however, the Third Circuit has compelled a non-signatories to arbitrate when the court has found that the non-signatory is bound by the arbitration agreement "under traditional principles of contract and agency law." *Id.*

### 1. *Third Party Beneficiaries*

■ Defendants argue that because DuPont is a third party beneficiary to the Sanlong Joint Venture Contract, it should be bound by the terms of the contract and compelled to arbitrate. Defendants principally rely on one case to buffet their argument, *Barrowclough v. Kidder, Peabody & Co., Inc.*, 752 F.2d 923, 938 (3d Cir.1985) *overruled in part sub nom. Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110 (3d Cir.1993). Because that case is distinguishable on its facts, this court will not

compel DuPont to arbitrate its claim as a third party beneficiary.

In *Barrowclough,* the Third Circuit considered whether the court could compel the third party beneficiaries of a deferred payment program under ERISA to arbitrate a settlement. Barrowclough was employed by Kidder, Peabody as an account representative and investment advisor. For tax purposes, Kidder, Peabody allowed its executives, including Barrowclough, to defer up to one-fourth of their salary. Upon his termination from the firm, Kidder, Peabody refused to pay Barrowclough the deferred amount. Barrowclough and his contingent beneficiaries sued Kidder, Peabody for a refund of the deferred salary.

As a prerequisite to his employment, Barrowclough signed an agreement with the New York Stock Exchange and American Stock exchange that required him to submit to arbitration all disputes arising out of his employment or termination from employment. The Third Circuit held that this agreement bound not only Barrowclough, but also the additional plaintiffs because they claimed "no present entitlement to the deferred compensation and press[ed] no claims separate from [Barrowclough's]." *Id.* at 938. Thus, despite being non-signatories, the court bound the additional plaintiffs to the arbitration.

Here, however, DuPont cannot be said to be in the same position as those third party defendants. DuPont is more than simply a beneficiary to a contract. First, DuPont asserts claims independent from DuPont China. Instead of being a mere beneficiary and thus an interested party in the outcome of the litigation, DuPont asserts that the defendants injured DuPont directly by failing to provide the loan guarantees necessary to fund Sanlong.

Second, although it is the majority shareholder of DuPont China and stands to benefit from the profits of the Joint Venture Contract, DuPont cannot reasonably be called a mere third party beneficiary. Shareholders benefit from the profits of their investments, but this does not necessarily bind them to the agreements of the corporation.

Therefore, this court will not compel Du-Pont to arbitrate its claims as a third party beneficiary.

### 2. *Estoppel*

Next, defendants argue that because Du-Pont's claims are founded on the Joint Venture Contract, DuPont should be estopped from avoiding the arbitration obligations of the underlying contract. There are two different estoppel theories that may apply here.

First, the Second Circuit has compelled arbitration where the non-signatory knowingly exploited and directly received benefit from a contract that contained an arbitration clause. *See Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.,* 9 F.3d 1060 (2d Cir.1993). When the non-signatory has notice of an arbitration clause within an agreement and accepts the benefit of the agreement without signing a contract, the non-signatory is estopped from denying its obligation to arbitrate. *See Thomson–CSF,* 64 F.3d at 778. Defendants have not argued, and this court does not find this branch of the estoppel theory applicable. Here, Du-Pont did not take the benefit and refuse to abide by the terms of a known, but unsigned contract as in *Deloitte Noraudit A/S.*

Other circuits have recognized an alternative estoppel theory. Under this theory, on which defendants rely, several circuits have prevented a signatory from avoiding arbitration with a non-signatories "when the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Id.* at 779; *see also Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.,* 10 F.3d 753 (11th Cir.1993); *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.,* 863 F.2d 315 (4th Cir.1988). The situation here, however, is inverse. Rather than compelling a signatory to arbitrate claims, defendants want the court to compel a non-signatory to arbitrate. This is an all important distinction. As the Second Circuit observed:

> Arbitration is strictly a matter of contract; if the parties have not agreed to arbitrate the courts have no authority to mandate that they do so. In the line of cases discussed above, the courts held that the

parties were estopped from avoiding arbitration because they had entered into written arbitration agreements, albeit with the affiliates of those parties asserting the arbitration and not the parties themselves. *Thomson–CSF,* 64 F.3d at 779. DuPont, despite its relationship with DuPont China, did not agree to arbitrate its claims. Therefore, there is no reason to bind DuPont to the arbitration obligations of the Joint Venture Contract under the estoppel theory.

### 3. *Agency*

Lastly, defendants argue that Du-Pont should be bound by the arbitration agreements under traditional agency theories. Defendants assert that "DuPont was so intimately involved in the Sanlong project that [DuPont China] frequently acted on its behalf (as well as for itself)." Despite this assertion, this court is not willing to use "traditional principles of contract and agency law" to circumvent the protections of the corporate form and bind a corporate parent to contracts made by its subsidiary. Defendants have cited no precedent that goes so far.

Defendants cite *Bel–Ray v. Chemrite, Ltd.* as permitting such an action. In *Bel–Ray,* the Third Circuit framed the arbitration issue as "whether an employee or agent who did not agree to arbitrate can be compelled to arbitrate his personal liability on the basis of a commitment made by the corporation he serves." 181 F.3d at 445. There, the court held that officers and directors of a company were not compelled to arbitrate their individual liability simply because their corporate principal agreed to arbitrate. The Third Circuit could find no reason to bind the officers and directors under traditional principles of agency or contract law. Thus, the Bel–Ray decision fails to lend credence to defendants' argument on two grounds. First, the *Bel–Ray* court refused to compel arbitration. Second, the *Bel–Ray* plaintiffs wished to compel the agents of a company to arbitrate. Here, the reverse is at issue and the alleged principal, DuPont, is not even a signatory.

The other Third Circuit case on which defendants rely, *Pritzker,* turns not on agency principals, but on the construction of the

arbitration clause at issue. Therefore it is irrelevant to this discussion.

Defendants have not cited a case in which a court has compelled a parent company to arbitrate based on an agreement signed by a subsidiary. In *Thomson–CSF*, on which the defendants rely, the Second Circuit considered a similar issue. There, plaintiff purchased a subsidiary company that had previously agreed to arbitrate disputes under a contract with the defendant. After enumerating and examining five common law principles of agency or contract upon which the court might compel arbitration from a non-signatory,—(1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel—the Second Circuit overturned the district court's order compelling arbitration. *Thomson–CSF*, 64 F.3d at 776.

Specifically, the court held that because the contract was signed prior to purchase of the subsidiary, the parent could not be bound under an agency theory. *Id.* This case presents a closer question due to the nature of the negotiations, however, defendants have not offered any reason to bind DuPont under traditional notions of contract or agency law. DuPont China signed the Joint Venture Contract and DuPont, as a shareholder of DuPont China, stood to benefit from the profits of that contract, but defendants have not shown that DuPont China acted specifically as DuPont's agent.

#### 4. *Motion to Stay the Proceedings Pending the Outcome of Arbitration*

Since this court has determined not to dismiss this case and compel DuPont to arbitrate, Rhodia and Rhodia Fiber argue that this court should stay the proceeding pending the outcome of the arbitration.

This court has discretion to grant or deny a stay pending the decision in another proceeding. Although the power to grant a stay has ordinarily been granted to wait for a decision in a matter pending in state court, "a stay may be appropriate where the pending proceeding is an arbitration." *See Nederlandse Erts–Tankersmaatschappij, N.V. v. Isbrandtsen Co.,* 339 F.2d 440, 441 (2d Cir.

1964). "The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North American Co.,* 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936).

Defendants have not provided an adequate rationale to stay the present proceedings. Both parties agree that the Singapore arbitration panel will decide this case in the early part of 2001. Despite the potential for some factual overlay between this case and the arbitration, allowing this case to proceed to discovery should not be a significant detriment to either party.

Thus, the motion for stay pending the outcome of the Singapore arbitration will be denied.

### III. *Conclusion*

For the foregoing reasons, this court denies defendants' motions to dismiss for lack of personal jurisdiction, motion to dismiss for ineffective service of process, motion to dismiss for failure to join an indispensable party, motion to dismiss for forum non conveniens, and defendants' motion to compel arbitration.

This court will order an opinion in accordance with this Opinion denying Rhodia and Rhodia Fiber's motions.